# EXHIBIT F

**Investigative Report of MCI**
Janeen Long, Public Utilities Regulatory Analyst III
California Public Utilities Commission
Consumer Protection and Safety Division
505 Van Ness Avenue, Room 2205
San Francisco, CA
415-703-1246

I.     CASE SUMMARY

On June 20, 2000, the California Public Utilities Commission ("Commission") and the State of California Attorney General's Office filed a joint civil complaint against Worldcom, Inc. and MCI Worldcom Communications, Inc. in the Superior Court, County of San Francisco for various violations of the Public Utilities and California and Business and Professions Code. On March 7, 2002, the parties filed a stipulated Final Judgment and Permanent Injunction ("Final Judgment") with the Superior Court. In June 2002, the Consumer Protection & Safety Division ("CPSD") began its monitoring[1] of MCI's compliance with the terms of the settlement agreement.

As part of CPSD's monitoring efforts, we began reviewing complaints filed against MCI with the Commission's Consumer Affair's Branch[2] ("CAB") during the period April 2002 thru December 2004. In reviewing these CAB complaints, CPSD found that approximately 200 consumers complained to the Commission that they had received a bill from MCI for a Minimum Usage fee ("MUF") charge that they did not authorize. CPSD interviewed 115 of these complainants who told us that they at one time were subscribed to MCI's long distance services, but that they had called MCI and requested that their service be canceled. These consumers told

---

[1] CPSD conducted monitoring of MCI's compliance with advertising, telemarketing, billing and collection, and customer service requirements as set forth in the Final Judgment

[2] CAB is a branch of the Consumer Service and Information Division ("CSID") formerly known as the Communication and Public Information Division ("CPID").  CAB answers general questions about utility services, and assists consumers in resolving informal complaints about utility service or unfair practices. CAB staff receives consumer inquiries and complaints via telephone, email, fax, in person, and in writing.

1   CPSD that after several months and in some cases, years after canceling their service, MCI billed

2   them a MUF. Attached to this investigative report are seventy-seven (77) declarations[3] in which

3   the consumers state that MCI billed them a MUF they did not authorize.

4        In October 2003, CPSD initiated an investigation into MCI's billing former and non-

5   customers a MUF. On March 3, 2004, CPSD issued a Cease & Desist letter directing MCI to

6   cease billing its former customers a MUF. CPSD alleges that MCI has violated and is currently

7   in violation of Public Utilities Code Section 2890(a), regarding cramming. To date, MCI has

8   refused to adhere to two separate Cease & Desist requests.

9

10  **II.     APPLICABLE RULES AND LAWS**

11  <u>Cramming</u>

12       **Public Utilities Code Section 2890(a)** states, "A telephone bill may only contain charges

13  for products or services, the purchase of which the subscriber has authorized".

14

15  **III.    RESPONDENT**

16  <u>License History</u>

17       MCI provides local, local toll, and long distance telephone services to California

18  consumers. MCI has filed with the Commission the following company names and utility

19  numbers: MCI Metro Access Transmission Services dba MCI Metro, U-5253-C; MCI Worldcom

20  Communications, Inc. dba Worldcom, U-5378-C; MCI Worldcom Network Services, Inc., U-

21  5278-C; and, MCI Worldcom Network Services, Inc., U-5011-C. For complete background

22  information about these companies, please refer to **Appendix A** of this investigative report.

23       On December 5, 1997, Worldcom, Inc. and MCI Communications Corporation filed a

24  joint Application (A.) 97-12-010 with the Commission seeking approval of a merger of the two

25  companies. On August 31, 1998, the Commission adopted D.98-08-068, authorizing the merger

26  between Worldcom, Inc. and MCI Communications Corporation. The merger consolidated the

27  operating authorities of the two companies' existing subsidiaries. Specifically, under the new

28  name MCI Worldcom Communications, Inc. the company would continue to provide retail long

29

30  ─────────────

[3] Attachment I contains consumer declarations.

customer complaints, handles collection and credit reporting actions against customers, and provides customer service to its customers. For example, the Final Judgment prohibited MCI from billing a consumer charges, taxes, and fees after the consumer canceled their service with MCI.

The Final Judgment prohibited MCI from taking or continuing collection action against a customer when the customer disputed the amount owed by making a complaint or telling a MCI Collection Agent about the dispute. Additionally, MCI stipulated that it would resolve a customer's complaint within 30 days of receipt and provide the customer with a written explanation or verbal description of the resolution of the dispute. MCI also agreed to disclose when a customer calls to cancel its service that the customer must first contact the new carrier of choice, or their local telephone company to switch their telephone service away from MCI. According to the Final Judgment, MCI was obligated to advise the customers that unless they contacted their local telephone company regarding the change in service provider, MCI would remain the customers' long distance carrier and that the customer's rates would increase. Additionally, MCI was required to provide the consumer telephone numbers for major Local Exchange Carriers ("LEC"), Interexchange Carriers ("IEC") and/or offer to transfer the consumer to the LEC or IEC as well as make best efforts to make available an automated process that informs the consumer to contact the LEC or the preferred new provider.

In June 2002, CPSD began monitoring MCI's compliance with the terms of the Final Judgment. Specifically, CPSD monitored MCI's compliance with the advertising, telemarketing, billing and collection, and customer service requirements as set forth in the Final Judgment. Part of the monitoring process involved reading approximately 1500 MCI written consumer complaints filed with the CAB during the period April 2002 through August 2004. CAB categorized these written complaints under the following complaint sub-categories: Slamming, Cramming, Abusive Marketing, Disputed Bill and Company Practice.[6]

---

[6] The aforementioned categories are defined by CAB; Slamming: switching a consumers InterLATA and/or IntraLATA service without authorization; Cramming: Unauthorized charges on bill, services not ordered; Abusive Marketing: Marketing misrepresentations regarding services; Company Practice: Management policies and standards of accepted good business practices, Employee conduct, and/or Delays in access to the utility.

In addition to reading these consumer complaints, CPSD interviewed consumers who complained that they had been Slammed by MCI. CPSD learned from interviewing these complainants that many of them were former subscribers of MCI's services, and had not been billed by MCI for some time. These former customers of MCI told CPSD that they had called and canceled their service with MCI, but subsequently MCI had opened a new account in their name and billed them a MUF.

In October 2003, CPSD initiated an investigation into MCI's practice of billing former customers a MUF after consumers had called MCI and requested that MCI cancel their service.

## VI.    MCI'S MINIMUM USAGE FEE PROGRAM

On June 1, 2002, MCI implemented a $3 MUF[7] to its MCI's Basic Dial-1[8] customers with interstate service. According to MCI, customers who do not generate at least $3.00 in billings for long distance calls in a given month are charged the difference between $3 and the amount of the charges for calls made. For example, if a customer made $1.50 in long distance calls, the customer would be billed $3 ($1.50 for the call and $1.50 to complete the $3 minimum). MCI assesses the monthly Basic Dial-1 minimum charge to only those customers that have an existing Basic Dial-1 account. Residential customers who call the LEC to request MCI long distance service are placed on the Basic Dial-1 plan by MCI as a default choice until the customer notifies MCI of their calling plan choice. MCI refers to these accounts as LEC installed accounts. Accounts installed through the LEC reconciliation process also receive Basic Dial-1 service as explained in the section below.  Customers who call MCI to cancel a calling plan are placed on Basic Dial-1 service, pending MCI receiving a cancel notification from the customer's

---

[7] Attachment C contains a copy of MCI's November 14, 2003 data request response in which MCI describes its Minimum Usage fee program.

[8] According to MCI's General Service Agreement for Residential Customers a Basic Dial-1 account allows a customer to place a long distance call from their home telephone by dialing 1 + the area code + 7-digit telephone number, if you have selected the Company for long distance service and if both your home telephone and the called number are located within the U.S. mainland, Alaska, Hawaii, or the U.S. territories (See Attachment D for a copy of MCI's General Service Agreement for Residential Customers).

1   local telephone company. On January 1, 2003, MCI increased the MUF from $3 to $5. As of July

2   1, 2004, the $5 MUF for Basic Dial-1 was replaced with a $3.95[9] monthly recurring fee for

3   existing Dial-1 customers, and LEC installed customers.

4        CPSD accessed MCI's website (www.mci.com) specifically under the Consumer tab, and

5   found that the Basic Dial-1 calling plan does not appear as a choice to a new consumer who is

6   looking to sign up onto a long distance plan[10] with MCI. In fact, MCI's website only provides

7   two (2) long distance *only* calling plans from which a consumer can select. However, MCI's

8   General Service Agreement[11] states that the Basic Dial-1 account allows customers to place long

9   distance calls from their homes if they have *selected* MCI for long distance service. Hence, LEC

10  reconciliation customers do not "select" MCI as their long distance company, but are assigned to

11  the Basic Dial-1 plan as a default for remaining PIC'd to MCI. The following section explains

12  the LEC reconciliation process.

13  How MCI Obtains Information Regarding LEC Reconciliation List

14       MCI purchases a list of telephone subscribers from the LEC. This list is a "snapshot" of

15  the customer list file from the LEC. The customer list file is also referred to as a reconciliation

16  list, and could include former customers of MCI. These former customers may have cancelled

17  service with MCI, but did not contact the LEC to advise that they had cancelled their service

18  with MCI. Thus, unbeknownst to the customer, they are still PIC'd to MCI and appear on the

19  reconciliation list. MCI compares the reconciliation list from the LEC to its own list of active

20  accounts. A former customer appearing on the reconciliation list would appear as inactive

21  account because they have not made any long distance calls. If there is a telephone number on

22  the reconciliation list from the LEC that MCI does not have an active account for, MCI creates a

23  new account for that line so that it can bill the owner of the line.  MCI does not verify whether a

24  customer has previously requested termination of his or her service with MCI before creating a

25  new account and billing the customer a MUF. MCI then uses Transaction Code Status Indicator

---

[9] Refer to Attachment X

[10] Attachment E contains print screens of MCI's Local & Long Distance Plans obtained from MCI's website.

[11] See Attachment D

1    ("TCSI") code 2414[12] to communicate to the LEC the reason that MCI has created an account for

2    the customer.

3         MCI also obtains customer Primary Interexchange Carrier ("PIC") data by

4    communicating with the LEC through the Customer Account Record Exchange ("CARE"),

5    which is a daily exchange of customer PIC information supplied by the LEC to the IEC.

6    **MCI's Use of the LEC Initiated or LEC Installed Accounts**

7         MCI uses the term "LEC initiated change in service"[13] to describe a number of common

8    situations in the industry in which the Local Exchange Carrier, not MCI, has provided

9    notification to MCI that the customer's service should be with MCI. MCI also explains that it

10    does not generally communicate with the LEC about these issues through written

11    correspondence. Instead, the industry has developed TCSI codes so that telecommunication

12    providers can communicate about the reasons for a customer's change in service. For example[14],

13    the first two digits of the Transaction Code represent the kind of transaction being processed,

14    such as PIC change, information request, etc. The second two numbers are unique to each

15    Transaction Code, and represent details associated with the transaction. Thus, in the case of a

16    PIC change, if the first set of numbers in the Transaction Code is 01, the code used to indicate a

17    PIC change or subscription order, the second set of numbers in the Status Indicator would be 01,

18    which indicates "do a PIC change on this telephone number". Subsequently, the TCSI code for a

19    PIC change is TCSI 0101, and together they define the purpose of each transaction.

20         MCI advised[15] CPSD that it uses TCSI Code 2414 to "indicate that MCI created an

21    account to prevent casual or random billing. It results from MCI's use of a reconciliation list that

22    it periodically purchases from the LEC. This list shows customer telephone numbers that are

23    designated to the MCI Network even though MCI may not be maintaining an account with that

---

[12] Refer to Attachment F where MCI states TCSI code 2414 is used to indicate that MCI created an account to

prevent casual or random billing.

[13] Attachment F contains a copy of MCI's September 15, 2003 data request response.

[14] Attachment G is a copy of Qwest's Regional Subscription System User Guide – Customer Account Record

Exchange TCSI's document from which this example was obtained.

[15] Refer to Attachment F

user." However, it appears that the use of TCSI code 2414 may be utilized differently by others in the industry. In Qwest's Regional Subscription System User Guide – Customer Account Record Exchange TCSI's online document, Qwest states that the Transaction Code 24 is used to provide end-user information to the long distance provider in the subscription process. It is intended to be used for information only and should not be confused with a Transaction Code 20, Subscription Order Install or a Transaction Code 28, Pending Subscription Order. Hence, while others in the industry recognize that inactive customers may in fact simply need to be PIC'd away, MCI is using TCSI code 2414 to communicate to the LEC that it has created an account for billing purposes.

## V.     CONSUMER COMPLAINTS (CRAMMING)

During this investigation, CPSD reviewed approximately 2750 written complaints filed with the Commission between April 2002 and December 2004. CPSD obtained these complaints from CAB. After completing our review, we found approximately 200 complaints in which the complainant alleged that they were being billed a MUF by MCI without customer authorization. Seventy (70) declarants confirmed that they at one time had MCI as their service provider, but that they had terminated their service with MCI and MCI later billed them a MUF. Attachment I contains seventy-seven (77) declarations we received from these consumers who we interviewed. The most common complaint of all declarants involves the following scenarios in which MCI imposed a MUF.

**Customers Who Switched Away From MCI to Another Carrier**

Twenty-eight (28) declarants told us that they had formerly been a customer of MCI, but had changed to another provider. These declarants stated that they telephoned MCI and requested that their long distance service be canceled. These declarants stated that they then switched their long distance service to another carrier and months (and in some cases years) later, MCI billed them a MUF, even though they had selected another IEC.

**Customers Who Canceled MCI Service With No New Carrier Selection**

Thirty declarants (30) told us that they had formerly been a customer of MCI, but had subsequently telephoned MCI and requested that their long distance service be canceled without subscribing to a new provider. These consumers stated that they did not switch their service to

another carrier, but rather opted to use a cellular telephone, a calling card, or dial around (10-10-XXX) to place long distance calls. MCI later billed them a MUF.

Within this same complaint scenario, three (3) declarants stated that when they canceled their MCI service, they opted not to choose another carrier because they were moving to a new home, out-of-state, out of area, or would not be using that particular landline, yet MCI managed to track them down and bill them a MUF at their new location. Specifically, one (1) declarant advised that he had MCI service when he lived in Colorado Springs, Colorado. However, when he moved to California in 1999, and established service with a different carrier, MCI billed him a MUF to his new telephone number at his California residence while he was receiving service from a different carrier.

### Customers Who Never Had MCI Service on A Secondary Telephone Line

Nineteen (19) declarants told us that they had formerly been customers of MCI, and were billed for service on a second line after they canceled their MCI service. These individuals told us that they had two telephone lines in their homes, with only one serviced by MCI. On that one line, MCI provided the subscriber with long distance service, and on the consumers second line, they had no long distance service and used the line to access the Internet or to fax documents. These declarants told us that they telephoned MCI and requested that their long distance service be canceled with MCI on the line being serviced. According to these declarants, MCI canceled the service as requested, but then later established a new account on the consumer's second line. MCI then billed the consumer a monthly MUF.

### Customers Who Never Had MCI Service on Any Telephone Line

Seven declarants (7) maintain that they never had MCI on any of their telephone lines, yet received a bill for a Minimum Usage fee.

CPSD's analysis further revealed that consumers who cancelled their service with MCI before the March 7, 2002 Final Judgment were later billed a Minimum Usage fee. Upon a consumer's request for termination of MCI service, the Final Judgment[16] ordered MCI to disclose to the consumer that they must contact their new preferred carrier or their LEC to switch service. Eleven (11) declarants canceled service with MCI in years ranging from 1992 to 1999,

---

[16] See Attachment B

1   well before the March 7, 2002 Final Judgment. Thus, these declarants were not afforded the

2   opportunity of receiving notification from MCI, yet were billed the Minimum Usage fee.

3       Additionally, twelve (12) declarants either received or were threatened with reminder,

4   late payment, or collection notices from MCI and outside collection agencies for not paying the

5   Minimum Usage fee. Forty-two (42) declarants were continually billed, some up to six months

6   after lodging a complaint with MCI and requesting that the service be canceled. Thirteen (13) of

7   the declarants advised that they had contacted MCI more than once to have MCI cease billing the

8   MUF. Five (5) declarants maintain that when they canceled service with MCI, they also had the

9   LEC place a PIC freeze on their accounts.

10  **MCI's Written Response To Consumer Complaints Regarding the Minimum Usage Fee**

11      In its response letters[17] to consumer's CAB complaints, MCI explains that it has

12  established an account for the customer based on an *order* it received from the customer's local

13  telephone company and that it "cannot stop this type of account from being established".

14  According to MCI, the order from the LEC indicates that the customer's PIC is in fact MCI, even

15  though MCI's own records indicate that the customer is not an active MCI customer. MCI's

16  letter further explains that it does not directly solicit the consumer to subscribe to its service.

17  Rather, MCI receives information from the consumers' LEC that shows MCI as the customer's

18  long distance provider. MCI then initiates the subscription based solely on that information. This

19  explanation leads the customer to believe that the LEC has actually ordered or initiated the long

20  distance subscription with MCI on their behalf. MCI also states that it does not have the ability to

21  switch the consumer's long distance carrier designation away from MCI, and that it is the

22  responsibility of the local telephone company to update and maintain the consumer's records

23  with respect to their chosen long distance company. Nonetheless, MCI advises the consumer

24  that it is canceling the customer's account following the consumer's contact with MCI's

25  Customer Service Department.

26      MCI's response letters also include various explanations for the MUF billing. In some

27  instances, MCI states in its response letters that it creates a "new" account for the customer for

28

29

30  [17] Attachment H contains sample copies of MCI's complaint response letters to consumers. Some complaint
    response letters are also attached to the consumer declarations in Attachment I.

*billing purposes.* MCI's explanation in these response letters is altogether different than the explanation it provided to CPSD indicating that the purpose of establishing these new accounts was to ensure that the customer is not left without service[18]. Moreover, MCI is not billing the customer using the customer's former or original account number with MCI, but rather MCI creates a brand new account. The customer then receives an initial billing from MCI that contains verbiage in the right hand margin stating, "Our records indicate that you recently selected MCI as your new carrier for telecommunications service(s)". The declarants indicated that they had not recently selected MCI at all, and that they thought they had canceled service with MCI. MCI's complaint response letter informed 55 declarants that MCI established an account "after receiving an order," "notification," or "information," from the consumer's local telephone company that the customers long distance service should be with MCI.

Consumers complained that when they received this initial billing from MCI, they had attempted to resolve the cancellation of the account directly with MCI, but MCI was unresponsive. It appears that MCI only resolved the consumer's complaint after the consumer filed a written complaint with the Commission. MCI would then typically offer a 100% refund for those consumers who complained to the Commission about the MUF, including associated taxes and surcharges. Despite MCI's claim that it cannot cancel a customer's account, CPSD found that MCI frequently stated in its response letters that it had canceled the customers account. However, some letters also indicated that MCI can cancel a customer's telephone number, which then cancels the calling plan. Twenty (20) MCI response letters in **Attachment H** state that MCI canceled the consumer's account and issued a refund.

**SBC's Business Office Referrals – Cramming Report**

On a monthly basis, SBC provides CPSD with its Business Office Referrals ("BOR") Cramming Report[19], which tracks, by month, the number of Cramming complaints it receives from its California subscribers for companies that bill for their services through SBC's billing

---

[18] Refer to Attachment J for a copy of MCI's March 12, 2004 data request response.

[19] Attachment K contains 2002-2004 Annual (Redacted) and Monthly copies of SBC's Business Office Referrals ("BOR") – Cramming Report for 2002, 2003 and 2004.

records. This report also provides account notations by SBC representatives as to the nature of the Cramming complaints. SBC also provides an annual version of the BOR report, which provides the total number of Cramming complaints per carrier for a 12 month period.

According to the 2002 annual BOR report, beginning July 2002 - the implementation date of MCI's Minimum Usage fee program - through the end of the year, SBC received a total of 1172 Cramming complaints against MCI. For the year 2003, the annual BOR report shows MCI received a total of 1154 Cramming complaints, and in 2004 it shows MCI as having received 573 Cramming complaints. For the years 2002 and 2003, MCI received the most Cramming complaints within a 12 month period compared to all other companies billing through SBC in 2002 and 2003, except for billing aggregators who bill monthly on behalf of multiple companies. See Table 1 below for a complete enumeration by month of the number of Cramming complaints attributable to MCI.

**Table 1**
Cramming Complaints
Source: SBC

**June 2002- December 2004**

| Year | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec. | Total |
|------|-----|-----|-----|-----|-----|------|------|-----|------|-----|-----|------|-------|
| 2002 | 60 | 55 | 74 | 86 | 129 | 157 | 320 | 270 | 207 | 174 | 104 | 97 | 1733 |
| 2003 | 92 | 112 | 122 | 111 | 93 | 164 | 120 | 92 | 71 | 68 | 49 | 60* | 1154 |
| 2004 | 70 | 49 | 82 | 29 | 31 | 36 | 77 | 74 | 57 | 38 | 21 | 9 | 573 |
|      |     |     |     |     |     |      |      |     |      |     |     |      |       |

*This number was obtained from a manual count of Cramming complaints on the SBC BOR Cramming Report for December 2003

CPSD's analysis of the Monthly BOR report, specifically of the SBC representative notations, found that consumers complained that they were billed for a monthly fee they never authorized. Consumers also complained that they canceled, disconnected or never authorized

service, and that they had previously contacted MCI[20]. See Table 2 below for a sample of SBC representative notations concerning Cramming complaints received about MCI.

**Table 2**
Cramming Complaint Notations
Source: SBC

| TYPE | TP | SERVICE PROVIDER | PIN | R | MESSAGE/PRODUCT | AMT | BILL DATE | NAME/ADDRESS | NOTATION |
|---|---|---|---|---|---|---|---|---|---|
| CRAM | MCI | MCI TELECOMMUNICATIONS | 6618548017789 | R | MONTHLY CHARGES | $5.37 | Jul-02 | JOSE D GONZALEZ GARCIA 1032 AUSTIN CT ARVIN CA 93203-2046 | LD SRVC CANC 112401 ADJ 5.37 |
| CRAM | MCI | MCI TELECOMMUNICATIONS | 8056409585940 | R | MONTHLY CHARGES | $5.19 | Jun-02 | CHARLES RICHARDS 1043 DOMINION RD OJAI CA 93023-1553 | MCI 5.19 061302-MCI SRV WS DICNTUED 112401 FOR BTH LD/LPIC, ACCT EST PIC C LPIC C,MCI TLD SUB PB PUT THM BCK, ASSRD SUB NO ORDRS HVE BN PLCD BY PB ACCT IS STL EST W/NO LD. OR LCL TLL RCRSD 5.19 FOR ADJ,SOK |
| CRAM | MCI | MCI TELECOMMUNICATIONS | 3232941576273 | R | MONTHLY CHARGES | $12.66 | Mar-02 | RONALD A GLASGOW 4633 AUGUST ST APT 1 LOS ANGELES CA 90008-1538 | 5.15 MTH SRV CHG 5/02 BLD 2 MTHS AMT 12.66 MCI UNAUTH SUB CNCLD MCI ON 3/7/02*** |
| CRAM | MCI | MCI TELECOMMUNICATIONS | 3235871169023 | R | MONTHLY CHARGES | $23.80 | Jun-02 | SALVADOR CISNEROS 3714 E 55TH ST APT D MAYWOOD,CA 90270-4153 | LD SRVC CANC 022202/ADJ 23.80 APRIL 2 JUN BLS |

## VI.   DATA REQUESTS

### CPSD's Data Request Regarding Customers Being Billed a Minimum Usage Fee

On October 30, 2003, CPSD issued a follow-up data request[21] to MCI in an effort to learn more about MCI's MUF, and to understand MCI's business practice of billing former customers a MUF. CPSD asked MCI to provide a description of its MUF program, the reason why it was

---

[20] Attachment L is a spreadsheet with a sample of SBC representative notations from the BOR report where it is indicated that the customer complained, canceled, disconnected, or never authorized service with MCI.

[21] Attachment M contains a copy of the CPSD's October 30, 2003 data request.

established, and to provide the following information for those consumers who canceled their service with MCI, and were later billed a monthly minimum usage fee: (a) the number of consumers who were billed the MUF after canceling their service; (b) the total dollar amount in revenues MCI billed for the MUF; (c) the total dollar amount in refunds MCI provided for monthly MUF; and (d) the total number of consumer complaints MCI received concerning the MUF..

On November 14, 2003, MCI responded to CPSD's data request[22]. MCI provided CPSD with a description of its MUF program, including a document titled Business Case Write-Up, which explains why the program was established. The document explains that the MUF "project is needed to generate an additional $24.6M in revenue through the application of the new $3 minimum usage fee". The document also states that "if the project is not funded, MCI will lose the opportunity to receive $24.6M in revenue from Consumer customers who are not subscribed to a Long Distance Plan." In addition, the document explores the alternative of MCI continuing to do without a $3 MUF for non-Plan customers, but rejects that alternative stating, "it unnecessarily avoids a significant source of additional revenue from this customer segment." Thus, even though MCI itself acknowledges it could have avoided billing customers MUF's, it declined to do so simply because it was quite lucrative to impose these fees.

Additionally, in response to question 3 subparts a, b, c, and d, MCI stated that California consumers who cancelled their long distance service with MCI were not billed a monthly MUF and that MCI did not provide any refunds for the monthly MUF to customers who canceled their service with MCI, because MCI did not charge the monthly MUF to customers who canceled their accounts. MCI further explained that MCI did not bill any amounts for the monthly MUF to customers who canceled their service with MCI. MCI also maintained that it was not aware of any complaints or inquiries from consumers who canceled their service with MCI, and who MCI later billed a monthly MUF.

**CPSD's Follow-Up Data Request Regarding Customers Being Billed a Minimum Usage Fee**

On December 3, 2003, CPSD sent a subsequent data request[23] to MCI asking follow-up

---

[22] Attachment N contains a copy of MCI's November 14, 2003 response.

[23] Attachment O contains a copy of CPSD's December 3, 2003 data request.

questions related specifically to MCI's answer to question number 3 in its November 14, 2003 data request response. In its follow-up, CPSD asked MCI to (1) provide their definition of "cancellation" of service in the context of a customer requesting to terminate his or her service; (2) inform CPSD whether MCI records that the customer has "cancelled" service if the customers call and inform MCI that they no longer wish to continue MCI's long distance service; and to (3) provide the total number of California consumers who were billed a Basic Minimum Monthly Charge[24] ("BMMC") after having contacted MCI to request that their service be terminated.

On December 22, 2003, MCI responded to CPSD's December 3, 2003 data request[25]. In its response to questions 1 and 2, MCI maintains its definition[26] of "cancel" is the definition of "cancel" as set forth in the Final Judgment. MCI stated in its response that pursuant to the Final Judgment, "cancel" or "cancellation" of "long distance service occurs when MCI receives notification from the consumer's LEC that the consumer's Primary Interexchange Carrier ("PIC") has been changed to a new long distance provider". In response to question 2 subparts a, MCI further maintains that it records that a customer has "cancelled" service if the customer calls and informs MCI that he or she does not wish to continue MCI's long distance service. Additionally, in response to question 2 subpart b, MCI provides documentation regarding its practices and procedures in handling customer requests to terminate service. Much of this documentation contains practices and procedures pertaining to cancellation information, but appears to be limited to MCI's "The Neighborhood" service. "The Neighborhood" service is a bundled plan for local and long distance service. The consumers that complained to the Commission concerning the MUF were not subscribed to The Neighborhood, but rather were consumers who were arbitrarily placed on MCI's Basic Dial-1 plan.

In response to question 3, MCI stated that it does not have the ability to determine how many customers were billed a BMMC after the customer contacted MCI and requested that their service be terminated, and that MCI could not determine how many persons called MCI and

---

[24] The Basic Minimum Monthly Charge is also known as Minimum Usage Fee

[25] Attachment P contains a copy of the December 22, 2003 response.

[26] Refer to Attachment B, page 2.

requested that service be terminated. Moreover, MCI maintained that no person was billed a BMMC after the account was "cancelled" as that term is defined in the Final Judgment. Furthermore, MCI offered the aforementioned explanation as a response to question 3, subparts b, c, and d. Although MCI is relying on the language of the Final Judgment in its definition of "cancel" or "cancellation"[27] CPSD found that once a consumer complained to the Commission concerning MCI's MUF, MCI consistently stated in its response letters to consumers that MCI had canceled the established account[28].

## VII.    BILLING FORMER & NON-CUSTOMERS MINIMUM USAGE FEES FOUND ILLEGAL IN OTHER JURISDICTIONS

CPSD found that other States faced similar issues with billing former and non-customers Minimum Usage fees, and was subsequently found to be illegal in practice.

### Consent Decree Between AT&T and the Federal Communications Commission

On November 30, 2004, the Federal Communications Commission ("FCC") and AT&T Corp. ("AT&T") entered into a Consent Decree[29] that arose out of an investigation by the FCC's Enforcement Bureau concerning whether AT&T violated section 201(b) of the Communications Act of 1934 by erroneously charging a $3.95 basic rate monthly recurring charge ("MRC") to non-AT&T customers, and certain AT&T customers.

AT&T acknowledged in the Consent Decree that after January 1, 2004 due to coding and systems processing issues, it inadvertently billed the basic MRC to a total of 1,267,032 consumers, which included AT&T customers who were not on the basic rate state-to-state direct-dialed plan as well as non-AT&T customers in 50 states and the District of Columbia.

In accordance with the terms of the Consent Decree, AT&T agreed to verify the accuracy of its records for customer PIC status, to compare its records for its basic schedule long distance

---

[27] Refer to Attachment B for a copy of the Final Judgment, Attachment P for a copy of MCI's December 22, 2003 data request response.

[28] Refer to Attachment H for samples of MCI response letters.

[29] Attachment R contains a copy of the FCC Order and Consent Decree with AT&T.

customers in all 50 states to the records of certain local exchange carriers, and to make a voluntary payment of $500,000 to the United States Treasury.

**Assurance of Discontinuance Pursuant to Executive Law**

In June 2004, the Attorney General of the State of New York and AT&T Communications of New York, Inc. ("AT&T") entered into an agreement[30] based on an inquiry made into the business practices of AT&T.

The Attorney General received a number of complaints alleging that AT&T had repeatedly erroneously billed consumers, including (i) consumers who were not AT&T customers; (ii) consumers who previously had notified AT&T that they wished to cancel their AT&T long distance service; and (iii) consumers who had no billing history with AT&T for an extended period of time. Residential customers who had previously been assigned to or had chosen AT&T as their long distance carrier, but had not selected one of AT&T's Optional Calling plans were assigned by default to AT&T's "Basic Rate Plan". Until January 1, 2004, customers assigned to AT&T's Basic Rate Plan were billed only for long distance calls actually made and incurred no monthly recurring or minimum charges. Effective January 1, 2004, AT&T initiated a $3.95 monthly recurring charge ("MRC") of $3.95, plus taxes and other fees, on bills received by customers assigned to its Basic Rate Plan, regardless of whether the customer made any long distance calls. A number of consumers apparently were not aware they were assigned to AT&T, thought they had canceled AT&T as their long distance provider and/or had not used AT&T or received bills from AT&T for months or even years prior to January 2004.

Although AT&T mailed postcard notices to customers in November of 2003 informing consumers of changes to the basic rate plan, including the imposition of the $3.95 MRC beginning in January 2004, the notice expressly stated that the "change to the AT&T Basic Rate plan does not apply if you are no longer an AT&T customer or if you are enrolled in a domestic optional calling plan." The Attorney General alleged that this type of notification created the impression that the MRC did not apply to customers who had previously notified AT&T of their desire to cancel their long distance service, but failed to notify the LEC.

---

[30] Attachment S contains a copy of the Assurance of Discontinuance.

AT&T relies on the consumer's LEC to provide it with PIC data, which it receives via daily electronic feeds with participating LEC's, for the PIC status of its long distance customers. Other than the postcard notification, AT&T relied on the PIC status as reflected in AT&T's records and did not attempt any additional contact with these consumers in connection with the MRC to reconfirm their status. Thus, some consumers who did not know they were assigned to AT&T or believed they had canceled their AT&T accounts were billed by AT&T for the MRC and associated charges. When consumers complained to AT&T that they were not AT&T customers and were improperly billed for the MRC, AT&T responded with letters that advised these consumers that AT&T was selected as their long distance carrier during some portion of the billing cycle. A number of these consumers were actually not assigned to AT&T during any portion of the billing cycle. AT&T claims this occurred as a result of either incorrect or the lack of, PIC information from the LEC. Some consumers also advised the Attorney General that even after receiving confirmation and assurances from AT&T representatives that their billing problems had been corrected, AT&T continued to send them bills and past due notices for the MRC and related charges.

As a result of the agreement, AT&T agreed to immediately make its best efforts to verify its customer database with the LEC's, and regularly conduct internal reviews and updates of its database of previously billed customers to avoid improperly utilizing previously obtained billing name and address information in current billing cycles. The agreement also required that AT&T representative's record the date the customer notified AT&T of his or her desire to cancel AT&T's long distance service, whether it was by oral notification or by automated process. The agreement also required AT&T to immediately amend its basic rate plan customer list to exclude consumers who are not AT&T customers; to immediately cease collection efforts of the $3.95 MRC plus related charges; and to take steps to remove such charges from their bills for New York consumers who have not paid the MRC and have had no long distance direct dial usage on the AT&T network.

The agreement also required AT&T to re-notify all customers in New York who were on the AT&T basic rate plan notice advising them (i) that, according to AT&T's records, they are AT&T residential long distance customers assigned to AT&T's basic rate plan, (ii) that AT&T imposes an MRC on all basic rate plan customers, and the amount of the charge; (iii) a

description of other calling plan options (including a no fee plan) including how to sign up for one of those plans; and (iv) how to disconnect AT&T service if they decide they do not want to continue their AT&T service. AT&T agreed to pay the plaintiffs $400,000 for costs, penalties and any other claims by the Attorney General.

## VIII.   CPSD'S CEASE AND DESIST LETTER & MCI'S RESPONSE

On March 3, 2004, CPSD Director Richard Clark issued a Cease & Desist letter[31] directing MCI to cease billing former MCI customers a Minimum Usage fee. The letter stated that CPSD had issued the letter because of the numerous consumer complaints relating to MCI's unlawful practice of billing former customers a MUF. The letter expressed CPSD's concern with MCI's practice of sending these consumers to collections when they refuse to pay the MUF. CPSD informed MCI that if its definition of "cancel" or "cancellation" is based on the Final Judgment, it is an erroneous interpretation as it conflicts with state law making it invalid and unenforceable. CPSD noted that the Final Judgment maintains that "nothing within the Final Judgment shall be deemed to permit or authorize any violation of any law of the State of California or regulation of the California Public Utilities Commission". In addition, CPSD once again requested that MCI provide responses to the following questions: (1) the name and BTN of ALL California consumers who were billed a MUF from June 1, 2002 to the present. CPSD asked that this information be provided regardless of whether MCI has a record of the consumer requesting termination or disconnection; and, (2) the name, title, and business address of each individual who was responsible for the decision to implement and charge a MUF to MCI's Basic Dial-1 customers.

On March 12, 2004, MCI's Director of Public Policy, Richard Severy, responded[32] to CPSD's Cease & Desist letter. MCI maintains that it does not charge a MUF to a customer who has canceled service with MCI. MCI's response also stated that MCI follows the definition of "cancel" as set forth in the Final Judgment. MCI stated that it remains obligated to the expired

---

[31] Attachment T contains a copy of the March 3, 2004 Cease & Desist letter.

[32] Attachment J contains a copy of this response.

term of the February 29, 2000 Consent Decree with the FCC[33] that ensures that MCI will not remove a customer's billing records until MCI receives notice from the customer's LEC that the customer has cancelled his or her account with MCI. MCI also maintained that if it were to cancel customer accounts upon request by customers without first receiving notification of a new provider from the LEC, the customers would have their service canceled without a new provider in place and could be subject to random or casual billing by MCI. MCI stated that CPSD's suggestion that MCI's cancel policy is prohibited by the Final Judgment because the Final Judgment does not authorize any violations of the law is without merit. Thus, MCI declined CPSD's directive to cease and desist its current practice of billing former customers an MUF after they have requested cancellation of MCI's service. Moreover, MCI did not respond to questions 1 and 2 in the Cease & Desist letter, and offered no explanation.

**MCI's Follow-Up Response to Cease and Desist Letter**

On June 25, 2004, MCI sent a follow-up response[34] to CPSD's request for information, initially made March 3, 2004 in Richard Clark's Cease & Desist letter. The follow-up response provided answers to questions 1 and 2 of the Cease & Desist letter. Specifically, it included a CD Rom containing approximately 500,000 names and billing telephone numbers of California consumers who were billed the MUF on a Basic Dial-1 account between June 2002 and February 2004, and the names and titles of the MCI employees responsible for implementing the MUF to MCI's Basic Dial-1 customers[35]. The information contained on the CD Rom is the information CPSD had twice requested in its October 30, 2003 and December 3, 2003 data requests.

**CPSD'S September 15, 2004 "Meet & Confer" With MCI**

On September 15, 2004, CPSD staff and legal team met with members of MCI's management and legal team at the Commission to discuss MCI's practice of billing non-MCI customers a MUF, and to verify whether CPSD and MCI could come to an agreement where MCI would stop this practice based on CPSD's assertion of Cramming. Attendees of this meeting included me, Janeen Long, CPSD Director Richard Clark, CPSD Program & Project

---

[33] See Attachment Q

[34] Attachment U contains a copy of MCI's June 25, 2004 follow-up data request response.

[35] Some of the individuals listed were involved in the decision making process, but are no longer employed by MCI.

1   Supervisor Sarita Sarvate, CPSD Utility Enforcement Supervisor Duane Filer (via conference
2   call from CPUC Los Angeles Office), and Utility Enforcement Investigator Linda Woods. CPUC
3   staff Counsel attendees included Travis Foss, Chris Witteman, and Jason Zeller. Attendees on
4   behalf of MCI included Richard Severy, Director of Public Policy, Sally McMahon, Vice
5   President of Consumer Affairs & Quality, Gail Garey, Director of Consumer Affairs & Quality,
6   and MCI Attorney William Single. In preparation for this meeting CPSD compiled a list of
7   technical questions[36] pertaining to MCI's MUF program, which were forwarded to MCI before
8   the meeting. MCI provided CPSD with a confidential seven page document[37] that includes two
9   paragraphs from its General Services Agreement, as well as overview of MCI's Minimum
10  Usage, Long Distance Cancel Process, and LEC Database Reconciliation Process. The document
11  also included a flow chart titled LD Cancels, which according to MCI, was provided to show
12  how MCI handles a call from a customer requesting to cancel long distance service.
13          Based on the discussions with MCI at this meeting, CPSD confirmed that MCI uses
14  certain CARE codes to identify consumers who are still PIC'd to MCI, but who do not have any
15  long distance call activity. MCI signs these consumers up to their Basic Dial-1 calling plan.
16  Since the consumer is not making any long distance calls, MCI then bills the consumer a MUF.
17  MCI advised in the meeting that this is done to prevent random or casual billing rates.
18  Nonetheless, before imposing this charge MCI does not contact the consumer to verify that the
19  consumer actually "selected" and wants MCI as its long distance provider.  MCI indicated that
20  before signing a customer up on the company's Basic Dial-1 calling plan and billing a consumer
21  the monthly recurring fee it makes no effort to verify through its customer contact notations
22  whether the consumer may have previously called to cancel service with MCI.  Additionally,
23  MCI advised that administrative and billing errors can occur, because it relies on CARE data
24  provided by the LEC to inform about a consumers PIC selection.
25          MCI also made clear that it cannot "de-PIC" a consumer, however, it was also clear
26  that MCI has several other options to not bill a non-MCI customer. MCI has the option of
27  "taking the account down", which is the way MCI described being able to stop all billing on an
28
29
30  [36] Attachment V is a copy of the CPSD list of the questions provided to MCI.

    [37] Attachment W is a copy of this document.

1  account. Another option would be to block an account as MCI would do in a case of non-
2  payment by an MCI customer. MCI could even implement a $0.0 billing process and refrain
3  from billing the minimum recurring fee until it has verified with the consumers that they wish to
4  remain on MCI's Basic Dial-1 plan, or that they would like to select another one of MCI's
5  calling plans. MCI maintained that its records indicate that the level of MUF complaints had
6  dropped following a completion of the last major LEC database "reconciliation" effort in
7  California. MCI offered to investigate all such complaints from June 2003 to the present, and
8  promised to report back to CPSD with its findings of whether the consumers were former or non-
9  MCI consumers who had been billed an MUF.

10  **FCC Rulemaking Concerning Minimum CARE Obligations on LEC's & IEC's**

11      The FCC recently adopted a Notice of Proposed Rulemaking into the Rules and
12  Regulations Implementing Minimum Customer Account Record Exchange Obligations on All
13  Local and Interexchange Carriers[38] which addresses issues involving the CARE system,
14  including making it mandatory for all LEC's to provide uniform, timely, and complete CARE
15  data in order to prevent errors. MCI offered reply comments in that proceeding supporting
16  AT&T's proposal for implementation of a mandatory minimum CARE standard.

17      The FCC maintained that CARE data is not currently exchanged in a uniform manner
18  now that the number of LEC's has increased. Interexchange carriers may not know whether a
19  customer remains on the network, has switched to another local or long distance carrier, has been
20  disconnected, or has made changes to the billing, name and address information. This can inhibit
21  customers' ability to move seamlessly from one carrier to another, and can result in substantial
22  increases in unbillable calls and customer complaints. Additionally, carriers may be viewed as
23  responsible for double or continued billing, cramming, and slamming.

24  **CPSD Staff Counsels Follow-Up Letter to MCI Regarding the September 15, 2004 Meeting**

25      On October 13, 2004, Staff Counsel submitted an emailed letter[39] to MCI re-capping
26  our findings based on the "Meet & Confer" with MCI. Staff Counsel reiterated CPSD's position
27  that because the billing of the MUF's result in cramming complaints, CPSD demanded that MCI

28

29

30  [38] Attachment X is a copy of the Notice of Proposed Rule Making.

[39] Attachment Y is a copy of CPSD Staff Counsel's email to MCI.

1  take steps to mitigate the illegal practice of imposing MUF's on non-customers. CPSD's Staff

2  Counsel requested that MCI place a moratorium on the imposition of MUF's on consumers, until

3  those consumers have been contacted and have verified that they intend to have MCI as their

4  long distance provider.

5      As an attachment to the email, CPSD and Staff Counsel submitted a spreadsheet of 25

6  consumer names, along with the billing telephone numbers ("BTN"), of consumers who

7  submitted a complaint to CAB relating to the MUF issue from September 2003 thru September

8  2004. This spreadsheet was submitted per MCI's assertion that the level of MUF complaints had

9  dropped following a completion of the last major LEC database "reconciliation" effort by MCI in

10  California. CPSD retrieved the complaints through the CAB tracking database by running a

11  query of closed complaints filed under CAB sub-categories: Slamming, Cramming, Abusive

12  Marketing, Disputed Bill and Company Practice.

13      To date, CPSD or Staff Counsel has not received a response from MCI pertaining to

14  MCI's analysis of the complaints.

15

16  **IX.    CONCLUSION**

17      Based upon the evidence presented, CPSD believes that MCI's current practice of billing

18  former and non-MCI customers a Minimum Usage fee is both improper and illegal, and that it

19  constitutes a form of Cramming.

20      Below is a summary of the evidence documented in this report that supports these

21  allegations:

22      ▪ According to the Consumer Affairs Branch complaint tracking database, the CAB

23        documented approximately 200 consumer complaints that related to the unauthorized

24        billing of a Minimum Usage fee by MCI. CPSD reviewed and analyzed approximately

25        200 complaint letters where the consumers complained that they either were never an

26        MCI customer, or were a former customer of MCI, but had canceled service, yet were

27        still billed a Minimum Usage fee after an extended period and no call activity.

28      ▪ CPSD reviewed and analyzed SBC's Annual and Monthly Business Office Referrals

29        Cramming Report for the years 2002 thru 2004. These reports indicated that consumers

30

1     contacted the LEC to complain about the unauthorized billing of the Minimum Usage fee
2     ·by MCI, and to ask SBC to reverse the charges.

3     ▪ CPSD interviewed and obtained 77 declarations from consumers who described their
4     attempts at having MCI cease billing of the Minimum Usage fee, collection efforts for the
5     Minimum Usage fee, and to cancel the accounts that MCI had established without·
6     authorization.

7     ▪ CPSD presented evidence of MCI's admission in the September 15, 2004 Meet & Confer
8     that MCI charges a Monthly Recurring fee to former and non-MCI customers; MCI does
9     not verify through its customer contact notations whether the consumer previously called
10     to cancel MCI service; and MCI does not contact customer to verify if the customer
11     wants MCI service before signing a customer onto its Basic Dial-1 plan.

14 **CPSD Recommendations for Recourse**

15     ▪ CPSD recommends that the Commission order MCI to stop the practice of billing former
16     and non-MCI subscribers a MUF.

17     ▪ CPSD recommends that the Commission order MCI to provide refunds to all former and
18     non-MCI subscribers who were incorrectly charged and paid a MUF.

19     ▪ CPSD recommends that the Commission order MCI to present a work plan detailing how
20     MCI will refrain from billing former and non-MCI customers a MUF.

1
2

## INDEX OF ATTACHMENTS

3
4
**Attachment A** – Civil Complaint Case No. 313730, California Public Utilities Commission and the State of California Attorney General's Office v. MCI Worldcom Communications, Inc.
5
6
7
**Attachment B** – State of California Public Utilities Commission and California State of California Attorney General's Office Final Judgment and Permanent Injunction with MCI
8
9
10
**Attachment C** – November 14, 2003 data request response by MCI
11
12
**Attachment D** – MCI's General Service Agreement for Residential Customers
13
14
**Attachment E** – Print screens of MCI long distance plans
15
16
**Attachment F** – September 15, 2003 data request response from MCI
17
18
**Attachment G** – Qwest Regional Subscription System User Guide – Customer Account Record Exchange TCSI's
19
20
21
**Attachment H** – Sample copies of MCI's complaint response letters to consumers
22
23
**Attachment I** – Consumer declarations
24
25
**Attachment J** – March 12, 2004 data request response from MCI
26
27
**Attachment K** – 2002-2004 Annual (Redacted) and Monthly SBC's Business Office Referrals – Cramming Report
28
29
30

Attachment L – Spreadsheet of sample SBC representative notations from the BOR report

Attachment M – CPSD's October 30, 2003 data request

Attachment N – November 14, 2003 data request response from MCI

Attachment O – CPSD's December 3, 2003 data request

Attachment P – December 22, 2003 data request response from MCI

Attachment Q – FCC Order and Consent Decree with MCI

Attachment R – FCC Order and Consent Decree with AT&T

Attachment S – State of New York Attorney General and AT&T Assurance of Discontinuance

Attachment T – March 3, 2004 Cease & Desist letter to MCI

Attachment U – June 25, 2004 follow-up data response from MCI

Attachment V – CPSD list of questions to MCI re: the Minimum Usage fee process

Attachment W – MCI's September 15, 2004 confidential document

Attachment X – FCC Notice of Proposed Rule Making

Attachment Y – CPSD Staff Counsel's email letter to MCI

<u>APPENDIX A</u>

<u>RESPONDENTS</u>

- <u>Entity Name:</u> MCI Worldcom Network Services, Inc. (U-5011-C) f/k/a Worldcom Network Services, Inc. (U-5278) and MCI Telecommunications Corporation (U-5011-C)

- <u>Mailing Address:</u> 1133 19th Street NW, Washington D.C. 20036

- <u>Corporate Address:</u> 500 Clinton Center Drive, Clinton, MS 39056

- <u>Corporate Officers:</u> Michael D. Capellas, Chairman, CEO and President

- <u>Corporate Status and Date:</u> Active, MCI Worldcom Network Services, Inc. is a Delaware corporation. The company's corporate identification number is C0675788. In May 1999 MCI Worldcom Network Services, Inc. filed a name change with the California Secretary of State.

- <u>Agent for Service of Process:</u> The Prentice-Hall Corporation System, Inc., 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833.

- <u>CPUC Authority:</u> Commission Decision 84-01-037 granted MCI Telecommunications authority to provide IntraLATA services; Commission Decision 87-03-066 granted Commission Decision 92-06-064 authorized the merger of WTG-West, Inc. and WTG of California, Inc. into Wil-Tel, Inc.[1]; gave Worldcom Network Services, Inc. authorization to provide InterLATA and IntraLATA interexchange services to other carriers[2]; Commission Decision 90-82-012 gave MCI Telecommunications Corporation authority to operate in California as an Interexchange Company (IEC), providing interLATA and intraLATA interexchange services to California consumers.

---

[1] CPUC number U-5278-C was assigned to Wil-Tel; see Advice Letter No. 18 re: the proposed transfer of control of WilTel to LDDS Communications, Inc.; see Advice No. 28 re: the corporation's name change from WilTel, Inc. to Worldcom Network Services, Inc. d/b/a WilTel Network Services, Inc.; see Advice Letter 45 re: Worldcom Network Services, Inc. cancellation of its fictitious name d/b/a WilTel Network Services

[2] see MCI Worldcom, Inc. 1999 Affiliate Transaction Report

- **Assigned Utility No.:** U-5278-C and U-5011-C [IEC]

- **Services Provided:** InterLATA and IntraLATA Interexchange services to other carriers; InterLATA and IntraLATA Interexchange Reseller

- **Parent Company:** MCI

- **Entity Name:** MCI Worldcom Communications, Inc. f/k/a Worldcom Technologies, Inc. (U-5378-C) & MCI Telecommunications Corporation (U-5011-C)

- **Corporate Officers:** Michael D. Capellas, Chairman, CEO and President

- **Corporate Status and Date:** Active, MCI Worldcom Network Services, Inc. is a Delaware corporation, having filed a name change with the California Secretary of State in May 1999. California corporate identification number is C01929907.

- **Agent for Service of Process:** CSC-Lawyers Incorporating Service, 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833.

- **CPUC Authority:** Commission Decision 84-01-037 granted MCI Telecommunications authority to provide IntraLATA services; Commission Decision 94-03-083 authorized the merger of MidAmerican Communications Corporation, Advanced Telecommunications Corporation and Dial-Net, Inc. into and with LDDS Communications, Inc.[1]; Commission Decision 98-08-068 granted approval of Worldcom, Inc. and MCI Communications, Inc. to merge.

- **Assigned Utility No.:** U-5378-C [CLR, IEC]

- **Services Provided:** InterLATA and IntraLATA Interexchange services[2]

- **Parent company:** MCI

---

[1] CPUC number U-5378-C was assigned to LDDSMetroMedia Communications, the surviving named entity; see Advice Letter No. 5 re: proposed transfer of control of WilTel to LDDS Communications, Inc.; see Advice Letter 14 re: corporate name change from LDDS Communications, Inc. d/b/a LDDSMetroMedia Communications to Worldcom, Inc. d/b/a/ LDDS Worldcom; see Advice Letter No. 37 re: the cancellation of trade name LDDS Worldcom.

[2] see Worldcom, Inc. 2001 Affiliate Transaction Report, California Annual Report-Attachment B.

-28-

# EXHIBIT G

# REDACTED

Subject: 05/30 Flashes - CONS CS: Dial One Minimum
@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@
@@@@@@@@@@@@@@@@@@@
   FLASH   FLASH   FLASH   FLASH   FLASH   FLASH
   CONSUMER CS    CONSUMER CS    CONSUMER CS
   FLASH   FLASH   FLASH   FLASH   FLASH   FLASH
@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@
@@@@@@@@@@@@@@@@@@

1. Dial One $3.00 Minimum                CONS CS

OVERVIEW
========
Effective 6/1, MCI will introduce a $3.00 monthly minimum on
Dial-1 calling plans. The following plan codes are impacted:
CD1, MCI8, and customers without a plan.


COMMUNICATION
=============
Customers received advanced notification regarding the Dial-1
$3.00 minimum.

o Invoice Messages:

  Customers who received an invoice in April, received the
  following invoice message:

  "Effective June 1, 2002, your account will be subject
  to a $3 monthly minimum."

o Postcards:

  Customers who did not receive an April invoice (due to no
  usage) received a postcard ~ mailed 1st class on 5/13
  (see flash dated 5/13).


SR ROLE
=======
If a customer calls into Customer Service regarding the
Dial-1 $3.00 minimum, follow these steps:

1. Verify customer's current calling plan.
2. Advise the customer on the Dial-1 $3.00 minimum and the
   advance communication.
3. Do not issue credit.
4. Follow current conversion strategy outlined in
   Knowledgebase (index term: conversion).

11/03CAL:000001

1

5. If the customer says they no longer want MCI, follow
   current cancel guidelines, and issue credit for the
   minimum using code 318 Plan/Minimum Fees.
   (See positioning below)
6. Thoroughly note the account.

Sample positioning:
_____

"Mr/Mrs Customer, occasionally long distance companies modify
their fees and/or rates in order to continue to provide value
to their customers. While there was an increase associated
with your rate/fee, rest assured that you will continue to
receive very competitive long distance rates."

Some customers may call in stating that they no longer have
MCI as their Long Distance carrier. They may be pic'd to
another carrier, even though we still show an active MCI
account. If this happens, you should follow these steps:

1. Verify customer's account status and current plan.
2. Explain to the customer that they still have an active
   account with MCI.
3. If the customer continues to say that they no longer have
   MCI service, you may

the $3.00 minimum charge.
    Explain to the customer that they will need to call in
    next month for credit of the next prorated minimum charge.
4. Follow current cancel guidelines outlined in
   Knowledgebase (index term: Cancels or KnowledgeBase:
   procedures).

Note: Frontline SRs should attempt to handle all concerns
    and follow proper Egate transfer procedures.

Subject: 5/13 Special Edition CONS CS Flash: Dial-1 $3.00 Minimum Postcards

@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@
@@@@@@@@@@@@@@@@@@

***********SPECIAL EDITION  TRAINING FLASH***********

    Audience:  CONS CS

    Article:  Dial-1 $3.00 Minimum Postcards

    Date:  05/13/02

    Source:  Ray Whoolery

@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@
@@@@@@@@@@@@@@@@@@
OVERVIEW
========
On 5/13, MCI will mail 1.6M postcards to Dial-1 customers
notifying them of the $3.00 monthly minimum usage requirement
which begins 6/1. These customers had no Long Distance usage
in April and did not receive an April invoice, therefore they
haven't received an invoice message notifying them of the
$3.00 minimum. These postcards will be in either English or
Spanish and may generate calls into Customer Service.

The toll free number on the English postcards will route

11/03CAL:000002

2

customers to a new VRU where they can:

- Hear more information about the new Dial-1 $3.00 minimum.

- Select option 1 to have their calling plan converted from
  Dial-1 to MCI Anytime Calling (CHIP).

- Select option 2 to have their account cancelled.

- Hang up and call another toll free number (1-800-444-1616)
  to speak to a representative.

The toll free number on the Spanish postcards will route
directly to the Spanish CS department with a whisper: "Monthly
Minimum".

POSTCARD VERBIAGE
===================
The postcards will have the following verbiage speaking to
both the Dial-1 $3.00 minimum and the Sunday interstate rate
increase:

Dear MCI Customer:

Because MCI is committed to providing its customers with
complete and accurate information about our products and
pricing.  This postcard is to notify you of changes that
may affect your MCI service.

Beginning June 1, 2002, MCI will assess a monthly minimum
usage requirement for customers enrolled in our Basic Service.
Specifically, if your total monthly charges, excluding taxes,
are less than $3, MCI will bill you an additional amount
so that your total charges for that month are equal to the $3
monthly minimum charge.

In addition, the Basic Interstate Dial-1 Sunday rate will
change to $.20 per minute.

These changes will not apply if you're enrolled in one of MCI's
calling plans.  You can access your account online by visiting
www.mci.com/service.

If you believe that you are no longer an MCI customer and
received this postcard in error, please call 1-800-313-4236.
We appreciate your business and look forward to continuing to
serve you.

SR ROLE
=======
If a customer calls into Customer Service after receiving the
postcard to question the $3.00 minimum or the Sunday interstate
rate increase, follow the below steps:

1. Verify customer's current calling plan
2. Advise the customer on the Dial-1 $3.00 minimum and/or
   Sunday interstate rate increase
3. Do not issue credit
4. Follow current conversion strategy outlined in Knowledgebase
   (index term: conversion)
5. Thoroughly note the account

11/03CAL:000003

Sample positioning:

"Mr/Mrs Customer, occasionally long distance companies modify
their fees and/or rates in order to continue to provide value
to their customers.  While there was an increase associated
with your rate/fee, rest assured that you will continue to
receive very competitive long distance rates."

Some customers may call in stating that they no longer have
MCI as their Long Distance carrier.  They may be pic'd to
another carrier, even though we still show an active MCI
account.  If this happens, you should follow the below steps:

1.  Verify customer's account status and current plan
2.  Tell the customer that he/she still has ***an*** active
    account with MCI
3.  Follow current cancel guidelines outlined in
    Knowledgebase (index term: Cancels or KnowledgeBase:
    procedures)
4.  Frontline SRs should attempt to handle all customer
    concerns and follow proper Egate transfer procedures

11/03CAL:000004

# EXHIBIT H

L/ice

Mail Date
4/26/05

# FORMAL FILE COPY

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

Investigation on the Commission's own
motion into the operations and practices of
MCI, WorldCom, or MCI WorldCom, (U-
5011, U-5378, U-5253, U-5278), to
determine whether it has violated the laws,
rules and regulations governing the way in
which consumers are billed for products or
services, by billing its former customers
for a monthly service charge without
authorization.

FILED
PUBLIC UTILITIES COMMISSION
APRIL 21, 2005
SAN FRANCISCO
I.05-04-018

## ORDER INSTITUTING INVESTIGATION INTO THE OPERATIONS OF MCI, WORLDCOM, OR MCI WORLDCOM; ORDER TO SHOW CAUSE AND NOTICE OF OPPORTUNITY FOR HEARING

## I.    INTRODUCTION

From 2002 to the present, the Commission has received hundreds of consumer complaints regarding MCI, WorldCom, or MCI WorldCom's, (U-5011, U-5378, U-5253, U-5278 – hereinafter, "MCI"[1]) practice of billing non-customers for a type of monthly service charge that MCI refers to as a "minimum usage fee" (MUF)[2] The MUF charge is imposed as part of a basic default calling plan that MCI erroneously establishes for consumers, even though these consumers have not requested to be

---

[1] On April 1, 2003 MCI notified the Commission that it would conduct business under the brand name "MCI".

[2] Staff has reviewed approximately 200 MUF complaints, interviewed 115 of these consumers, and obtained 77 declarations from consumers documenting their experiences. The declarations are included with Staff's report for this investigation.

I.05-04-0    L/ice

Protection and Safety Division's (CPSD) Enforcement Branch (Staff) began its investigation after noting the high number of MUF-related consumer complaints received by the Commission's Consumer Affairs Branch (CAB).

Staff reviewed the consumer complaints received by CAB and found that MCI billed consumers a monthly service charge after the consumers requested that MCI terminate their long distance service, or in instances when the consumers were never MCI customers. Staff discovered that MCI's practice began on June 1, 2002 and continues to date. Staff has determined that MCI relies upon certain codes that it receives from the Local Exchange Carriers (LECs), although Staff has good reason to believe that MCI is misusing the codes that it requests and receives. The codes MCI relies upon are not the proper codes to indicate that a subscriber intends to establish a new account. Nevertheless, MCI proceeds to establish accounts and bill non-customers for an MUF without: 1) first attempting to contact the customer to verify that the customer intends to subscribe to MCI; 2) checking its own records to determine whether the customer is no longer a customer because he or she previously terminated their service with MCI. Staff has determined that MCI continues this practice to the present day, in spite of Staff's March 2004 directive to cease, desist, and/or mitigate the harm caused by the practice.

Public Utilities Code section 2890(a) states "A telephone bill may only contain charges for products or services, the purchase of which the subscriber has authorized." This practice is commonly referred to as "cramming". Staff believes MCI's assessment of an MUF on non-customers may constitute an unauthorized charge on the consumer's phone bill, in violation of section 2890(a). Public Utilities Code section 2889.5 requires a telephone company to obtain confirmation from the prospective subscriber that he or she intends to switch telephone companies; any change in service provider that is accomplished without complying with the steps described in section 2889.5 constitutes a "slam". Staff believes that MCI may be engaging in "slamming" by switching service providers or establishing a new account for a consumer without confirming the consumer's intent to switch to MCI or establish a new account with MCI.

193414    2

I.05-04-         L/ice

In addition, Staff has determined that it often takes several months for MCI to respond to consumer complaints and issue MUF refunds, and that consumers express a great deal of frustration with the time and effort it takes to contact an MCI service representative to have these charges removed from their phone bill. Staff has also determined that MCI has a practice of sending consumers to collection when they do not pay the MUF. Staff is deeply concerned by MCI's apparent disregard for the welfare of California consumers and by MCI's disregard of Staff's March 2004 directive to cease and desist, or to mitigate the harm cause by MCI's policies.

We hereby initiate this investigation to determine: 1) whether MCI has violated Public Utilities Code section 2890 by placing unauthorized charges on non-customers phone bills; 2) whether MCI has violated Public Utilities Code section 2889.5 by failing to confirm the consumer's intent to change service providers or establish a new account prior to placing the charge on the consumer's bill; 3) whether MCI should issue credits or refunds to consumers who have been billed for products or services they did not authorize; 4) whether MCI should be fined and/or sanctioned for engaging in a business practice that Staff alleges results in widespread "cramming" and/or "slamming"; and 5) whether, pursuant to Public Utilities Code section 761, MCI should change or modify its business practices that result in unjust, unreasonable, or improper charges being placed on a consumer's phone bill. We hereby order MCI to appear and show cause why it should not be ordered to cease its practice of billing minimum usage fees to non-customers.

## II.    SUMMARY OF STAFF ALLEGATIONS

Staff has prepared a report documenting its investigation to date, including declarations from victims documenting their experiences with MCI and documents obtained from MCI. The report is released today and shall be placed in the Commission's public formal file for this proceeding. The following is a summary of Staff's allegations to date.

I.05-04-0\*\*                                              L/ice

## A.     MCI's Minimum Usage Fee Program

Beginning in June 2002 and continuing to date, MCI began a policy of imposing a type of monthly service charge, which MCI refers to as an MUF, on previously inactive or closed accounts. Staff has determined that MCI's harvests information from two sources in order to identify inactive accounts and start billing. One method of harvesting inactive account information is when MCI regularly engages in an activity referred to as the "LEC Reconciliation Process". In this process, MCI first determines the identity of telephone numbers that are still assigned to MCI in the LEC's system, and then identifies those that it is not actively billing. Once MCI identifies the inactive telephone numbers, it creates a new account for these telephone numbers and begins billing an MUF.

A second method of harvesting inactive account billing information is when MCI obtains information regarding which telephone numbers are assigned to MCI through the transmittal of "Transaction Code Status Indicators" (TCSIs). TCSIs are electronic codes that telecommunications carriers routinely use to transmit subscriber assignment information to each other. In some cases, the codes inaccurately indicate that a customer has designated MCI as their long distance provider. Staff has determined that MCI knowingly takes advantage of these "coding errors" by billing inactive or closed accounts for an MUF, despite the fact that the LECs provide the TCSI codes "for information only" and do not intend that the codes be used to establish a new subscriber account for that particular customer[3]. Staff believes that MCI is knowingly misusing the TCSI codes to inappropriately establish new accounts.

---

[3] MCI requests the 2414 TCSI code from the LECs. The 2414 code is officially defined as "End Users Selected To Requesting AC For Post conversion Equal Access End Office(s)." Typically, this Transaction Code is used to provide end user information to the Access Carrier (AC) – in this case, MCI. It is intended to be used as information only and should not be confused with a TC 20 - subscription order install, or TC 28 - pending subscription order.

I.05-04-             L/ice

Through either the LEC Reconciliation Process or through TCSI codes, MCI creates a new account (which it calls the Basic Dial-1 plan[4]) and imposes the MUF without first contacting the customer to verify the customer's intent to switch, or first checking its records to determine if the customer previously cancelled the account with MCI. Essentially, MCI is acting on the subscriber information (TCSI codes) it receives from other carriers without checking to make sure that the subscriber has actually chosen MCI to be its long distance provider, and despite the fact that the TCSI code used by MCI is designated as "for information only" and is not the correct TCSI code to establish a new subscriber account.

MCI reports that between June 2002 and June 2004, approximately 500,000 California consumers have been billed a MUF pursuant to the Basic Dial-1 default calling plan. Prior to June 2002, consumers did not complain because MCI did not have an MUF associated with the default calling plan.

Staff has found that the process of calling MCI, removing the charges, and canceling the account often takes several months. Consumers who are billed an MUF typically call MCI repeatedly over several months, experience difficulty getting through to an MCI customer service representative and experience difficulty in having the charges reversed. Consumers complain that MCI refused to honor the initial request for cancellation and forced the consumers to go to great lengths to have the charges reversed, even though the charges were improper to begin with. Consumers state that MCI did in fact (eventually) cancel the account and discontinue billing, but some consumers express outrage because MCI sent the consumer's unpaid charges to a collection agency. The sections below describe different situations in which MCI billed consumers for an MUF.

---

[4] At the present, the Basic Dial-1 plan includes a $3.95 "minimum usage fee". The Basic Dial-1 plan is not advertised to the public, is not an option for prospective customers, and appears to be solely the default plan used when MCI has not contacted the prospective consumer to determine which MCI calling plan the consumer has chosen.

I.05-04-0        L/ice

**B.    Some Customers Switched From MCI To Another Long
Distance Carrier, Yet MCI Billed an MUF to This Non-
Customer**

In some cases, Staff's investigation reveals that MCI imposed MUFs on MCI
customers who switched away from MCI to another long distance carrier.  Consumers
complain that after switching away from MCI the former MCI customer receives a bill
(in many cases after several years have passed) from MCI for an MUF.  MCI imposed
this charge even though the consumer used a different long distance carrier and no longer
had any contractual relationship with MCI.

MCI refuses to change its behavior in these sorts of circumstances.  MCI
alleges that it imposes these charges because the consumer's new carrier fails to notify
MCI of the switch.  However, Staff believes that the consumer should not be held
responsible because MCI refuses to honor the request for cancellation directly from the
consumer, which means that the consumer has no control over whether MCI is notified of
the switch request.[5]  Staff believes it is MCI's responsibility to take the steps necessary to
ensure that it is not sending out bills to customers who have chosen another carrier.

**C.    Some Customers Cancelled Their MCI Service With No
New Carrier Selection, Yet Are Billed By MCI For An
MUF**

Consumers in California have many different options for making long
distance calls, such as the Internet, cellular phones, dial-around, calling cards, etc.
Increasingly, consumers are choosing to cancel their long distance carrier and are using
one of these other methods to make long distance calls.  In the past, MCI did not bill
consumers for an MUF when the consumer cancelled his or her long distance service
with MCI.

Beginning on June 1, 2002, customers who had cancelled their MCI service,
sometimes years ago, began to receive MCI bills for the MUF.  If MCI had checked its

---

[5] MCI only recognizes the notification of a PIC change if it is received from the LEC or the new carrier,
not the consumer.

I.05-04-0     L/ice

internal records prior to billing these customers, MCI's records would show that these former customers cancelled their long distance service with MCI. However, as described above, even though MCI is aware that that there may be a need to check on the accuracy of industry records MCI chooses not to check its existing customer records prior to creating a new account and imposing an MUF on the former customer.

Former MCI customers also complain that MCI bills an MUF when the customer cancels service because they are moving to a new home, a different area, out-of-state, etc. In those cases, MCI did not receive a switch notification for that account because the customer was not switching, but was simply canceling their service. In some cases, MCI alleges that it has failed to receive (or perhaps acknowledge) the notification code from the LEC. However, Staff believes that consumers are not at fault for any discrepancies that might occur as a result of infirmities in the providers' notification systems which MCI is aware of and which MCI is capable of mitigating. Staff believes that consumers should not be required to pay an MUF to a provider when the consumer has cancelled its subscription for that service.

**D.     Some Consumers Never Had MCI Service on a Primary or Secondary Telephone Line, Yet Are Billed By MCI for an MUF**

Consumers often have a second line dedicated to a fax machine, Internet service, etc. On initiating service, they do not select a long distance carrier for the second line because they do not plan on making any long distance calls on that line. The consumers' primary line is used for making long distance calls, while their secondary line is used for fax or Internet service. These consumers have the option to select no long distance company on the secondary line.

In cases reviewed by Staff, consumers report that MCI began billing the secondary line for an MUF, even though MCI was never the long distance carrier on that line. The consumer never requested MCI's service on the secondary line and made no long distance calls, nonetheless, MCI billed these consumers an MUF.

I.05-04-0        L/ice

In some cases, consumers report that they had never selected MCI on their primary line, yet were billed by MCI for an MUF on the secondary line. Staff believes these are clearly violations of the law that should not occur.

### E.    Directive to Cease and Desist

On March 3, 2004 Staff informed MCI that its practice of imposing monthly charges on non-customers, whether they were inactive accounts or customers who had not affirmatively selected MCI as their provider, is unlawful. Staff ordered MCI to cease and desist. Staff informed MCI that the practice results in charges being imposed for products or services that were never authorized or requested by the consumer, in violation of Public Utilities Code section 2890. On September 15, 2004, Staff met with MCI to direct the company to discontinue its practice of imposing MUFs, to discuss mitigating the harm to consumers caused by this practice and to discuss other technical issues related to how the MUFs are imposed. Staff believes that, to date, MCI has not stopped or modified its practice.

## III.    DISCUSSION

### A.    Violation of Public Utilities Code section 2890(a) – Cramming

Public Utilities Code section 2890(a) states "A telephone bill may only contain charges for products or services, the purchase of which the subscriber has authorized." Staff may recommend, and the Commission may consider, penalties pursuant to Public Utilities Code section 2107 and 2108 in the amount of $500 to $20,000 per offense per day. In each of the situations described in the summary of Staff's allegations, MCI may have imposed a monthly charge for long distance service that was not requested or authorized by the consumer, in violation of section 2890.

### B.    Violation of Public Utilities Code section 2889.5 – Slamming

Public Utilities Code section 2889.5 states that telephone companies must follow the requirements of that section prior to making any change or switch in service provider. Among other things, section 2889.5 requires telephone companies to

193414                                8

I.05-04-0          L/ice

thoroughly describe the nature and extent of the service being offered, to specifically establish whether the subscriber intends to make any change in his or her service provider, and to obtain and record confirmation by the subscriber of his or her intent to make any changes or switches.  In the situations described above, MCI may be making changes to the subscriber's service without the subscriber's authorization, in violation of section 2889.5.

**C.    Monthly Minimum Fees on Inactive Accounts Found Illegal in Other Jurisdictions**

We find that the above-described business practices may result in widespread violations of Public Utilities Code sections 2889.5 and 2890.  According to Staff, these same monthly fees have been found to be illegal in other jurisdictions.

**1.    State of New York**

In June 2004, the Attorney General of the State of New York and AT&T Communications of New York, Inc. (AT&T) entered into an agreement ending AT&T's practice of imposing monthly recurring charges (MRC) on non-customers.  AT&T's MRC was essentially the same type of charge as MCI's MUF.

In that case, the Attorney General received complaints alleging that AT&T had erroneously billed consumers who were not AT&T customers.  The erroneously billed customers fell into two groups (i) those who previously had notified AT&T that they wished to cancel their AT&T long distance service; and (ii) those who had not had a billing history with AT&T for an extended period of time.  Residential customers who had previously been assigned to or had chosen AT&T as their long distance carrier, but had not selected one of AT&T's optional calling plans were assigned by default to AT&T's "Basic Rate Plan".  Until January 1, 2004, customers assigned to AT&T's Basic Rate Plan were billed only for long distance calls actually made and incurred no monthly recurring or minimum charges.  Beginning January 1, 2004 AT&T began imposing a monthly recurring charge on bills received by customers assigned to its Basic Rate Plan, regardless of whether the customer made any long distance calls.  A number of consumers apparently were not aware that they were assigned to AT&T, thought they had

I.05-04-0         L/ice

canceled AT&T as their long distance provider and/or had not used AT&T or received bills from AT&T for months or even years prior to January 2004.

In that case, AT&T relied on the Primary Interexchange Carrier (PIC) status as reflected in AT&T's records and did not reconfirm the consumers' status by contacting the consumer and obtaining their authorization to institute the monthly recurring charge. Thus, AT&T billed an MRC to consumers who were unaware that they were assigned to AT&T or believed they had canceled their AT&T accounts. When consumers complained to AT&T that they were not AT&T customers and were improperly billed for the MRC, AT&T responded with letters that advised these consumers that AT&T was selected as their long distance carrier during some portion of the billing cycle. A number of these consumers were actually not assigned to AT&T during any portion of the billing cycle. Some consumers also advised the Attorney General that even after receiving confirmation numbers and assurances from AT&T representatives that their billing problems had been corrected, AT&T continued to send them bills and past due notices for the MRC and related charges.

AT&T agreed to immediately make its best efforts to mitigate the harm caused by the practice, by taking various steps to ensure the problem did not occur. The agreement also required AT&T to immediately amend its basic rate plan customer list to exclude consumers who are not AT&T customers, immediately cease collection efforts of the MRC plus related charges, and take steps to remove such charges from New York consumers who have not paid the MRC and have had no long distance direct dial usage on the AT&T network.

### 2.     Federal Communications Commission

On November 30, 2004, the Federal Communications Commission (FCC) and AT&T Corp. (AT&T) entered into a Consent Decree concerning whether AT&T violated section 201(b) of the Communications Act of 1934 by erroneously charging a monthly recurring charge to non-AT&T customers.

AT&T acknowledges in the Consent Decree that after January 1, 2004 due to coding and systems processing issues, it inadvertently billed the basic MRC to a total of

I.05-04-0...                                        L/ice

1,267,032 consumers, which included AT&T customers who were not on the basic rate
state-to-state direct-dialed plan as well as non-AT&T customers in 50 states and the
District of Columbia.

AT&T agreed, among many things, to verify the accuracy of its records for
customer PIC status, compare its records for its basic schedule long distance customers in
all 50 states to the records of certain local exchange carriers, and to make a voluntary
payment of $500,000 to the United States Treasury.

3.      **MCI Has No Mandate to Collect Minimum Usage**
        **Fees from Non-Customers**

MCI has informed Staff that federal law requires telephone companies to
maintain account records of former customers for three years, but has provided Staff with
no law that mandates that this expense be collected from non-customers. Staff has found
no federal or state law that allows MCI to bill non-customers for this minimal cost. Staff
believes that MCI has no contractual relationship with these consumers – the consumer is
not an MCI customer nor receives any long distance service from MCI. Staff concludes
that the consumer is not under an obligation to pay MCI's costs to maintain records.

Staff believes the consumer is being illegally charged by MCI for no usage
on a calling plan the consumer did not request nor authorize. Despite the lack of a
contract between the customer and MCI, the customer must engage in protracted
negotiations with MCI in order to remove the charges. The consumer is not empowered
to stop the billing because MCI will only recognize a PIC change request processed by
the LEC or the new carrier, not the consumer. Moreover, MCI is inappropriately using
TCSI codes that are "for information only" and not intended to be used to establish new
subscriber accounts. Therefore, Staff believes the consumer is not responsible for the
charges, and that the practice should cease.

Therefore **IT IS ORDERED** that:

1.  An investigation on the Commission's own motion is hereby instituted into
the operations of MCI, Worldcom, and MCI Worldcom (Respondents), to determine:

I.05-04-0    L/ice

    a.  whether Respondents violated P.U. Code section 2890 by imposing charges on consumers' bills for products or services which the consumer did not request or authorize;

    b.  whether MCI has violated P.U. Code section 2889.5 by failing to confirm the consumer's intent to change service providers or establish a new account prior to establishing a new account for that consumer;

    c.  whether Respondents should be ordered to pay reparations pursuant to P.U. Code section 734;

    d.  whether Respondents should be ordered to cease and desist from any unlawful operations and practices, or have special conditions and restrictions imposed on it, pursuant to P.U. Code section 761;

    e.  whether Respondents should be fined pursuant to P.U. Code sections 2107 and 2108 for violations of the P.U. Code or other order, decision, rule, direction, demand or requirement of the Commission.

    2.  Respondents are directed not to impose any monthly recurring service charges on customer accounts ("minimum usage fees" is the terminology used by Respondents) where the consumer has: a) contacted Respondents and requested cancellation, disconnection, termination, or otherwise requested that his or her service be discontinued; b) switched to another long distance carrier; c) never had Respondents as the selected long distance carrier.

    3.  Respondents are hereby ordered to appear and show cause why the Commission should not order Respondents to permanently cease and desist the practice of imposing any type of monthly recurring service charges without first obtaining authorization from the prospective customer, on a date to be set at the Commission's hearing room, 505 Van Ness Avenue, San Francisco, 94102.

    4.  To facilitate the completion of this investigation, and consistent with the provisions of section 314, Respondents are ordered to preserve until further order by the Commission all consumer account records, verification tapes, PIC dispute records, and consumer complaints involving California consumers who have complained to either

I.05-04-...                                        L/ice

CAB or to MCI regarding minimum usage fees, and to respond in a timely fashion to all of Staff's data requests.

5.  Staff's report includes information for Respondents that SBC has identified as proprietary pursuant to P.U. Code section 583.  Staff's report also includes documents obtained from MCI, which MCI has designated proprietary information.  The public interest in disclosure outweighs any need for confidentiality; thus any confidential information included with Staff's report is hereby made public.

6.  Staff shall continue discovery and continue to investigate the operations of Respondents.  Any additional information that Staff wishes to introduce shall be provided to the Respondents in advance of any hearings in accordance with the schedule directed by the assigned Administrative Law Judge.  Staff need only respond to discovery requests directed at Staff's investigation of the Respondents and Staff's prepared testimony offered in this proceeding.

7.  Staff shall monitor consumer complaints made against Respondents.  We expect Staff to bring additional evidence of any alleged harmful business practices by Respondents to our attention (e.g. new types of violations).  Staff may propose to amend the OII to add additional respondents or to raise additional charges.  Any such proposal shall be presented to the Commission in the form of a motion to amend the OII and shall be supported by a Staff declaration supporting the proposed amendments or additional named respondents.

8.  This ordering paragraph suffices for the "preliminary scoping memo" required by Rule 6 (c) of the Commission's Rules of Practice and Procedure.  This proceeding is categorized as an adjudicatory proceeding and will be set for hearing.  The issues of this proceeding are framed in the above order.  A prehearing conference shall be scheduled for the purpose of setting a schedule for this proceeding including dates for the exchange of written testimony, determining which of the Staff's witnesses will need to testify, and addressing discovery issues.  This order, as to categorization of this proceeding, can be appealed under the procedures in Rule 6.4.  Any person filing a response to this order instituting investigation shall state in the response any objections to

I.05-04-___                                         L/ice

the order regarding the need for hearings, issues to be considered, or proposed schedule.

However, objections must be confined to jurisdictional issues that could nullify any

eventual Commission decision on the merits of the alleged violations, and not on factual

assertions that are the subject of evidentiary hearings.

      Service of this order on Respondents will be effectuated by personally

serving a copy of the order and Staff's report on the Respondents' designated agent for

service in California:  The Prentice-Hall Corporation System, Inc., 2730 Gateway Oaks

Drive, Suite 100, Sacramento, CA 95833.

      This order is effective today.

      Dated April 21, 2005 at San Francisco, California.


          MICHAEL R. PEEVEY
             President
          GEOFFREY F. BROWN
          SUSAN P. KENNEDY
          DIAN GRUENEICH
             Commissioners

Certified as a True Copy
of the Original

CHIEF ADMINISTRATIVE LAW JUDGE
PUBLIC UTILITIES COMMISSION
STATE OF CALIFORNIA

ALJ/ G/jac

## BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Investigation on the Commission's own motion into the operations and practices of MCI, WorldCom, or MCI WorldCom, (U-5011, U-5378, U-5253, U-5278), to determine whether it has violated the laws, rules and regulations governing the way in which consumers are billed for products or services, by billing its former customers for a monthly service charge without authorization. | Investigation 05-04-018 |

## NOTICE OF ASSIGNMENT

Please be advised that Investigation 05-04-018 is being assigned to Commissioner Dian Grueneich and Administrative Law Judge Sarah R. Thomas.

Dated April 26, 2005, at San Francisco, California.

Angela K. Minkin, Chief
Administrative Law Judge

## PROOF OF SERVICE BY MAIL

I, _Sandra Jackson_, declare:

I am over the age of 18 years, not a party to this proceeding, and am employed by the California Public Utilities Commission at 505 Van Ness Avenue, San Francisco, California.

On _4/26/05_, I deposited in the mail at San Francisco, California, a copy of:

_I.05-04-018_

(Decision Number or Type of Hearing)

_4/21/05_

(Date of Hearing)

_I.05.04-018_

(Application/Case/OII/OIR Number)

in a sealed envelope, with postage prepaid, addressed to the last known address of each of the addressees in the attached list.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on _4/26/05_, at San Francisco, California.

_Sandra Jackson_

(Signature)

(Rev. 10/00)

I. 05-04-018

ID#4372/58
3/17/05
66
421

DECISION: I05-04-018

MAIL DATE: 4/26/05

Copy of **"ORDER INSTITUTING INVESTIGATION INTO THE OPERATIONS OF MCI, WORLDCOM, OR MCI WORLDCOM: ORDER TO SHOW CAUSE AND NOTICE OF OPPORTUNITY FOR HEARING"** mailed to the following.

**SEE ATTACHED LIST FOR APPEARANCES, STATE SERVICE**

Count_____

3/17/05
SMJ

*doc #15576 (rev. 3/4/98)*

*********** SERVICE LIST ***********
Last Update on 26-APR-2005 by: SMJ
I0504013 NOPOST

*********** APPEARANCES ***********

THE PRENTICE-HALL CORPORATION SYSTEM INC
SUITE 100
2730 GATEWAY OAKS DRIVE
SACRAMENTO CA 95833

********** STATE EMPLOYEE **********

Richard Clark
Consumer Protection & Safety Division
RM. 2205
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-2349
rwc@cpuc.ca.gov

Maxine Harrison
Executive Division
RM. 500
320 WEST 4TH STREET SUITE 500
Los Angeles CA 90013
(213) 576-7064
omh@cpuc.ca.gov

********* INFORMATION ONLY **********

Barry Ross
Executive Vice President
CALIFORNIA TELEPHONE ASSOCIATION
1851 HERITAGE LN STE 255
SACRAMENTO CA 95815-4923

Marcel Hawiger
Attorney At Law
THE UTILITY REFORM NETWORK
711 VAN NESS AVENUE, SUITE 350
SAN FRANCISCO CA 94102
(415) 929-8876 X 311
marcel@turn.org

Michael Shames
Attorney At Law
UTILITY CONSUMERS' ACTION NETWORK
3100 FIFTH AVENUE, SUITE B
SAN DIEGO CA 92103
(619) 696-6966
mshames@ucan.org