# EXHIBIT I

# ORIGINAL

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Investigation on the Commission's Own Motion into the Operations and Practices of MCI, WorldCom, or MCI WorldCom, (U-5011, U-5378, U-5253), to determine whether it has violated the laws, rules and regulations governing the way in which consumers are billed for products or services, by billing its former customers for a monthly service charge without authorization. | Investigation 05-04-018 (Filed on April 21, 2005) |

## JOINT MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT
*ATTACHED*

### I.    INTRODUCTION

Pursuant to the Commission's Rules of Practice and Procedures Rule 51, the Consumer Protection and Safety Division ("CPSD") and MCI, Inc. ("MCI") (collectively, the "Parties") respectfully request that the Commission approve and adopt the proposed settlement agreement, which resolves all of the issues in the case. The Parties believe the proposed settlement is in the public interest, reasonable in light of the record, and consistent with the law.

On April 21, 2005, the Commission entered an Order Instituting Investigation into the Operations and Practices of MCI (OII I.05-04-018 (the "OII")). The OII focused primarily on allegations that MCI had charged certain consumers a monthly service charge or minimum usage fee ("MUF") in a manner that did not comply with the requirement of the Public Utilities Code.

The attached proposed Settlement Agreement (Exhibit A hereto) has been negotiated by the Parties in good faith and resolves the issues set forth in the OII. The proposed settlement agreement contains the following provisions:  MCI acknowledges

204361

the seriousness of the concerns raised by the OII and the need to take measures to prevent the occurrence of the types of events described therein; as a result of this case MCI has committed to cease charging MUFs for accounts created as the result of information received through "reconciliation lists" from local exchange carriers, changed its cancellation procedures, taken other corrective measures, and agreed to continue these measures in the future; and finally, MCI will make a payment to the General Fund in the amount of $2,300,000, with a portion of that being set aside to make credits/refunds to complainants who disputed MUF billings where appropriate or other instances where MCI determines that an MUF billing was inappropriate.

The proposed Settlement Agreement is in the public interest in light of the acknowledgements by Respondent, the remedial steps already taken by Respondent to address the issues raised in the OII, Respondents' commitment to continue these remedial measures, and the payment to the General Fund as well as the issuance of credits to consumers. Based on the detailed joint statement of the case contained in the Settlement Agreement and agreed to by the Parties, the Settlement Agreement is reasonable in light of the record and consistent with existing law and precedent.

## II.    PROCEDURAL BACKGROUND

On April 21, 2005, the Commission entered OII I.05-04-018, instituting an investigation into MCI's practices relating to billing certain consumers an MUF allegedly without authorization. Administrative Law Judge Sarah Thomas scheduled a pre-hearing conference ("PHC") for June 29, 2005, in San Francisco.

At the conclusion of the PHC, ALJ Thomas issued an order that, among other things, adopted a schedule for submission of testimony and set an Evidentiary Hearing for October 11-14, 2005.

The Parties have conducted extensive good faith negotiations over the past several months. As a result of those negotiations, the Parties have now entered into the Settlement Agreement attached hereto.

204361

2

## III.    THE ISSUES

The issues raised in the OII included allegations that MCI improperly billed former of non-MCI customers an MUF that is contained in its interstate General Services Agreement. In the OII, the Commission indicated that MCI may have violated the requirements of Public Utilities §§ 2890(a) and 2889.5 by charging certain California consumers an MUF under certain sets of circumstances.

## IV.    THE PROPOSED SETTLEMENT AGREEMENT

### A.    Joint Statement of the Case

After extensive settlement discussions, the Parties agreed to a joint statement of the case and remedies in order to resolve this case. Importantly, the respondents acknowledge the seriousness of the concerns raised by the CPUC, the importance of taking steps to ensure that such problems are prevented, and have already instituted such preventative and remedial measures.

The joint statement of the case and remedies are set forth in the proposed Settlement Agreement attached as Exhibit A.

### B.    Preventative and Remedial Measures

Respondents have taken a number of measures designed to prevent the problems and concerns addressed in the OII. These include an industry-leading new long distance account cancellation policy. Under the new cancellation policy, the customer service representative is authorized to cancel a consumer's long distance service upon the consumer's request. MCI then provides the requesting consumer with notice advising him/her to contact the LEC to select a new carrier (or no carrier) and that if the consumer fails to select a new carrier his/her rates may increase. This new cancellation policy is designed so that consumers who request cancellation will **not be billed an MUF** following the billing period in which the cancellation is requested. The cancellation process has been designed to ensure that the consumer receives multiple notices relating to the effects of cancellation.

MCI has also committed to discontinue purchasing reconciliation lists from the major local exchange carriers in connection with utilizing such lists to establish MCI accounts which include MUFs. Furthermore, MCI has, where appropriate, issued credits or refunds to customers who raised complaints relating to MUF charges.

### C.     Payments

MCI will pay $2,300,000 to the State General Fund, with a $1 million portion of the payment set aside to issue credits to consumers who disputed the MUF billings where appropriate or other instances where MCI determines that an MUF billing was inappropriate, and after an eighteen month period MCI will provide an accounting of the amount of credits/refunds paid, with any money left reverting to the State General Fund as set forth in the Settlement Agreement.

### D.     Restitution

MCI has already issued extensive credits to consumers in connection with MUF billing issues. MCI has committed to continue to do so under its liberal credit policy, in which a customer service representative is authorized and instructed to credit a consumer who tells MCI that he/she has been charged an MUF in a situation where the consumer contends that he/she has not authorized such a charge and has not utilized the service.

### V.     THE PROPOSED SETTLEMENT IS REASONABLE IN LIGHT OF THE RECORD, CONSISTENT WITH THE LAW AND PRECEDENT, AND IN THE PUBLIC INTEREST

Pursuant to Rule 51.1(e) of the Commission's Rules of Practice and Procedure, settlements must be reasonable in light of the record, consistent with the law, and in the public interest. The Parties believe that the proposed settlement in this matter satisfies each of those criteria, and therefore recommend that the Commission approve and adopt the proposed settlement.

### A.     The Proposed Settlement Is Reasonable In Light Of The Record

The Parties have engaged in an extensive dialogue regarding MCI's operations and the measures MCI has implemented to prevent occurrence of the concerns identified

in the OII, and have developed a joint statement of the case that accurately reflects the record in this case. The Parties believe that MCI has fully responded to the Commission's concerns as raised in the OII. MCI has acknowledged the seriousness of the concerns raised by the OII and that such concerns relate to inappropriate practices that should not occur and for which preventative measures should be taken. MCI has, in fact, instituted preventative and remedial measures designed to address these issues, has confirmed that it will continue to adhere to such measures, as set forth in the Settlement Agreement. Furthermore, MCI has, where appropriate, issued credits to customers and has committed to continue to do so. Finally, MCI has agreed to make a payment into the State General Fund. Therefore, the proposed Settlement Agreement is very closely based on the record developed by the Parties, and is reasonable because it effectively addresses the specific issues raised by the evidentiary record.

**B.    The Proposed Settlement Is Consistent With The Law And Precedent**

As described above, the proposed Settlement Agreement resolves the issues set forth in OII. The Parties agree that the Settlement Agreement is consistent with existing law, and in some cases establishes measures which exceed what the law requires. Additionally, the terms of the Settlement Agreement are consistent with precedent established by other settlement agreements that the Commission has approved based on similar factual situations. The Parties are unaware of any conflict with any other provisions of law, and believe the provisions of the settlement are consistent with both State and Federal law.

**C.    The Proposed Settlement Is In The Public Interest**

The proposed Settlement Agreement is in the public interest because it protects consumers in several ways and ensures future compliance. For example, the Settlement Agreement in the public interest because MCI has undertaken a number of measures designed to prevent the problems and concerns addressed in the OII. These include an industry-leading new long distance account cancellation policy, and discontinuance of purchasing and reconciliation lists from the major local exchange carriers in connection

204361

with utilizing such lists to establish MCI accounts which include MUFs. Furthermore, MCI has, where appropriate, issued credits or refunds to customers who raised complaints relating to MUF charges.

### D.     Settlement Conference

Pursuant to Rule 51.1(b), the Parties held a public settlement conference on September 30, 2005, in Room 2204 at the Commission's headquarters, providing all Parties to the case an opportunity to review and discuss the proposed settlement. Written notice was provided to the service list seven days in advance, on September 23, 2005. No other parties appeared and no objections were received to the proposed settlement.

## VI.     CONCLUSION

For the reasons stated above, the Parties believe the proposed Settlement Agreement resolves all of the issues set forth in the OII, and that the proposed Settlement Agreement is reasonable in the light of the record, consistent with the law and precedent, and in the public interest. Therefore, the Parties jointly request that the Commission adopt the proposed Settlement Agreement in the form attached as Exhibit A.

204361

6

_Maureen F. Del Duca_

Maureen F. Del Duca
Helen G. Kirsch
MCI, Inc.
1133 Nineteenth Street, N.W.
Washington, D.C. 20036
Telephone: (202) 736-2477
Facsimile: (202) 736-6072
E-Mail: maureen.delduca@mci.com

_Charles P. Scheeler (by ___)_

Charles P. Scheeler
DLA Piper Rudnick Gray Cary US LLP
6225 Smith Avenue
Baltimore, Maryland 21209
Telephone: (410) 580-4250
Facsimile: (410) 580-3001
E-Mail: charles.scheeler@dlapiper.com

Attorneys for MCI, Inc.

_Travis T. Foss_

Travis T. Foss
Staff Counsel
Attorney for the Consumer Protection
and Safety Division
California Public Utilities Commission

September 30, 2005

204361

7

EXHIBIT A

## SETTLEMENT AGREEMENT

The Consumer Protection and Safety Division of the California Public Utilities Commission ("CPSD"), and MCI Inc. and its predecessors, successors, affiliates, and assigns ("MCI" or "Respondents") (collectively, the "Parties") hereby agree upon the following terms for the settlement (the "Agreement") of the Commission's Order Instituting Investigation, I.05-04-018 (the "OII").

### TERMS

**I.**     **JOINT STATEMENT OF THE CASE**

#### The Company

The Parties submit the following joint statement as the basis for the Settlement Agreement:

1.    MCI provides local, local toll and long distances services to California consumers. MCI has filed with the Commission the following company names and utility numbers: MCI Metro Access Transmission Services d/b/a MCI Metro, U-5253-C; MCI Worldcom Communications, Inc. d/b/a Worldcom, U-5378-C; MCI Worldcom Network Services, Inc., U-5278-C; and, MCI Worldcom Network Services, Inc., U-5011-C. For complete background information about these companies, please refer to Appendix A.

2.    On December 5, 1997, Worldcom, Inc. and MCI Communications Corporation filed a joint Application (A.) 97-12-010 with the Commission seeking approval of a merger of the two companies. On August 31, 1998, the Commission adopted D.98-08-068, authorizing the merger between Worldcom, Inc. and MCI Communications Corporation. The merger consolidated the operating authorities of the two companies' existing subsidiaries. Specifically,

under the new name MCI Worldcom Communications, Inc. the Company would continue to provide long distance service to its existing customers and to customers formerly served by MCI Telecommunications Corporation.

3.     On June 25, 1999, MCI Telecommunications Corp. notified the Commission through Advice Letter 373 of a name change due to its merger between MCI Communications Corporation and Worldcom, Inc.

4.     In its 2003 Annual Report, MCI Worldcom informed the Commission that as of April 1, 2003, the company would conduct business under the brand name "MCI".

**The Prior Proceedings**

5.     On June 20, 2000, the Commission and the State of California Attorney General's Office ("the parties") filed a joint civil complaint against Worldcom, Inc. and MCI Worldcom Communications, Inc. (Case No. 313730) in the Superior Court, County of San Francisco. The complaint alleged that MCI violated Business and Professions Code Section 17500 by making certain untrue or misleading statements through its marketing representatives and in its advertisements about MCI's calling plans and services, and violated Public Utilities Code section 2889.5 and 451 by converting certain consumers' long distance and local toll service to MCI service without the prior authorization of the consumer. The complaint further alleged that, by not thoroughly informing subscribers of the nature and extent of services being offered, MCI violated Public Utilities Code Section 2890 and section 451 by placing unauthorized charges on subscribers' telephone bills. Additionally, the Complaint alleged that MCI violated Public Utilities Code section 532 by charging persons, firms, corporations, and other entities who were not MCI customers for services they did not order.

6.      On March 7, 2002, the parties filed a stipulated Final Judgment and Permanent Injunction ("Final Judgment") with the Superior Court County of San Francisco. According to the Final Judgment, MCI agreed to pay the Plaintiffs up to $10 million in civil penalties and investigative costs. MCI agreed to refrain from various business practices the Commission alleged it violated in its complaint, and agreed to implement new policies and procedures changing the manner in which the Company advertised, telemarketed, solicited its services, billed its customers, resolved customer complaints, handled collection and credit reporting actions against customers, and provided customer service to its customers.

7.      MCI charges some of its customers a fee irrespective of whether there was usage in a given month (hereinafter referred to as an "MUF fee"). On June 1, 2002, MCI implemented an MUF fee of $3 on its Basic Dial-1 customers with interstate service. Customers who did not generate at least $3.00 in billings for long distance calls in a given month were charged the difference between $3 and the amount of the charges for calls made. For example, if a customer made $1.50 in long distance calls, the customer would be billed $3 ($1.50 for the call and $1.50 to complete the $3 minimum). MCI assessed the monthly Basic Dial-1 minimum charge to only those customers that have an existing Basic Dial-1 account. Residential customers who request MCI long distance service through their local exchange carrier ("LEC") are placed on the Basic Dial-1 plan by MCI as a default choice until the customer notifies MCI of their calling plan choice. MCI refers to these accounts as LEC installed accounts.

8.      In June 2002, CPSD began monitoring MCI's compliance with the terms of the Final Judgment. Specifically, CPSD monitored MCI's compliance with the advertising, telemarketing, billing and collection, and customer service requirements as set forth in the Final

Judgment. Part of the monitoring process involved reviewing MCI written complaints filed with the Consumer Affairs Bureau ("CAB") during April 2002 through August 2004.

9.     In addition to reviewing these consumer complaints, CPSD interviewed approximately seventy-seven (77) consumers who had registered complaints with the CAB. Many of these consumers were former subscribers of MCI's services, and had not been billed by MCI for some time. These former customers of MCI, however, alleged that subsequently MCI had opened a new account in their name and billed them an MUF.

10.     In October 2003, CPSD initiated an investigation into MCI's practice of billing former customers an MUF after consumers had called MCI and requested that MCI cancel their service.

11.     On April 21, 2005, the Commission filed the OII.

<u>Subsequent Events</u>

12.     Prior to February 2003, MCI periodically purchased or received lists of telephone subscribers from the major LECs. This list is a "snapshot" of the customer list file from the LEC. The customer list file is also referred to as a "LEC Recon List." As the executing carrier, the LEC has the responsibility of maintaining a record of the primary interexchange carrier ("PIC") to which each consumer is subscribed. In industry vernacular, the consumer is "PIC'ed" to that carrier. The LEC Recon Lists which MCI received showed the consumers "PIC'ed" to MCI according to LEC records. MCI also received information from LECs regarding changes in account information (for example, a name change when a subscriber gets married). If a telephone number appeared in the data received from the LEC for which MCI did not have an account, MCI created a new Dial-1 account for that line. After the institution of the MUF,

4

however, this practice resulted in the consumer being charged an MUF, which led in turn to certain consumer complaints.

13.    MCI has policies that address the situation in which a consumer calls to cancel his or her account. Historically, when a consumer contacted MCI to cancel long distance service, the consumer was advised to contact their LEC or their new long distance carrier of choice to insure the new consumer change was processed. This policy was in place because only the LEC, not MCI, has the ability to change the LEC records which identify the primary inter-exchange carrier for each consumer receiving local service from the LEC. MCI's policy was to cancel a consumer's account after confirmation was received from the LEC that the consumer had changed their primary interexchange carrier ("PIC") away from MCI. The process insured that a consumer would not be charged higher random rates when making long distance calls prior to the LEC changing the consumer's PIC. The consumer, however, would also continue to be charged an MUF or other plan fees until MCI received confirmation from the LEC that the consumer's PIC had been changed to a new long distance carrier.

14.    MCI's prior cancellation practice was consistent with a Consent Decree that it entered into with the Federal Communications Commission (File No. E. 99-04) (the "Consent Decree") on February 29, 2000. That Consent Decree (which expired on March 1, 2003) stated in pertinent part:

> ". . . MCI WorldCom will ensure that for all customers that request
> disconnection from the Company as their preferred interexchange
> carrier, the Company will not remove the customer's billing
> records until the Company receives notice from the customer's
> LEC that the customer has cancelled his or her account with MCI
> WorldCom." (emphasis added).

15.    The Consent Decree was entered into at a time when consumers had fewer practical choices other than wireline through which to receive long distance service. Today, far

more consumers are choosing non-wireline alternatives for long distance service than was the case five years ago. Accordingly, the concerns which informed the Consent Decree resolution—seeking to avoid customers who would be denied long distance access or charged higher, random rates for long distance access—are now substantially decreased.

16.     Additionally, MCI has seen MUF billing issues arise (apart from LEC Reconciliation situations) from the timing of the information it receives from the LECs relating to canceling customer accounts, or through the LEC's failure to send such information. MCI has been working to investigate the causes of these issues and institute operational enhancements to resolve these issues in consumers' favor.

17.     MCI's continuing efforts to address MUF billing issues have resulted in dramatic decreases in California consumer "complaints".[1]  Complaints relating to MCI's long distance plan and minimum fees have decreased from approximately 2,400 during the first quarter of 2003 to approximately 300 during the second quarter of 2005.

18.     MCI has also utilized a liberal credit policy to satisfy complaints from consumers regarding minimum fees. This policy is described in more detail in paragraph 25.

## II.    MCI COMMITMENTS TO OPERATIONAL IMPROVEMENTS

19.     MCI acknowledges that the complaints asserted by some consumers with CAB of inappropriate MUF billings warranted investigation and action by the CPSD to ensure

---

[1] All references to "complaints" or "complainants" in the Agreement utilize the definition for "complaint" set forth in the Final Judgment.

compliance with the law and to protect consumer welfare. MCI's prior cancellation practice caused some customers that had requested cancellation of their MCI service to be charged an MUF if MCI did not receive a notice from the customer's LEC that the customer had cancelled. MCI recognizes the need to update its policies as the industry and consumer choices change and to address the important concerns raised by California consumers and the CPSD's investigation. Accordingly, and as set forth below, MCI has instituted and will maintain measures and policies designed to prevent practices such as are alleged in certain of the complaints.

20.    MCI will institute and maintain the following operational improvements, subject to the limitations set forth in paragraphs 37 and 38. These operational improvements shall be applicable to all wireline long distance residential consumers and to MCI Mass Market small business customers.

21.    <u>MCI Long Distance Cancel Process</u>. Effective June, 2005, MCI instituted a new cancel policy whereby the customer service representative is authorized to cancel a consumer's long distance service upon the consumer's request. MCI then provides the requesting consumer with notice advising him/her to select a new carrier and that if the consumer fails to select a new carrier his/her rates may increase. Following the cancellation, MCI offers billing at Dial-1 rates for a grace period, followed by a period during which service is blocked to prevent random usage charges. At the conclusion of the block period, any calls made by the cancelled consumer traveling over the MCI system will be billed at random rates. The new cancellation process has been designed to ensure that the consumer receives multiple notices relating to the effects of cancellation. Included in the written notice that the consumer receives is a recommendation that the consumer contact his/her LEC or new carrier of choice to either request a designation of no long distance carrier or a new long distance carrier.

7

22.    <u>MCI Cancellation Process Change Objective</u>.  MCI's  cancellation policy has been revised so that consumers who request cancellation will not be billed an MUF following the billing period in which the cancellation is requested.

23.    <u>"LEC Recon List" and Account Maintenance Installations</u>.  In February 2003, MCI ceased purchasing "LEC Recon Lists" from major LECs and using their lists to ensure that all consumers "PIC'ed" to MCI according to LEC records had an MCI account.  MCI commits that it shall not create new accounts which include MUFs based upon reconciliation lists received from the LEC.

24.    MCI also receives, from time to time, account maintenance information from the LEC.  Account maintenance information includes such items as a consumer name change (e.g., if the consumer changed name as a result of marriage) or the correction of an address.  Historically, MCI has created a new account for a customer if it received account maintenance information for a telephone number for which no account existed.  This practice, although designed to prevent random billing charges, also caused some complaints to occur.  MCI commits that it shall not create new accounts which include MUFs based upon account maintenance information received from the LEC.

25.    <u>Other Commitments Related to MUF Charges</u>.

MCI is continually updating and refining its billing practices and information exchange practices with the LECs in order to ensure accurate billings of consumers and minimize consumer billing complaints, including complaints of customers contending that they have been charged a MUF without authorization.  For example, MCI has instituted a number of operational enhancements designed to eradicate consumer complaints relating to MUF billing arising out of the timing of information that MCI receives from the LEC.  MCI shall continue to use good faith

8

and commercially reasonable efforts to enhance its billing policies and procedures, particularly with regard to identifying cause and ultimately preventing complaints regarding alleged unauthorized billings of MUFs. MCI will also continue to use such efforts with respect to identifying and crediting consumers charged with an MUF where MCI determines that it is appropriate to do so.

26.     Credit Policy.  MCI has utilized a liberal credit policy pursuant to which a customer service representative is authorized and instructed to credit a consumer who communicates to MCI that he/she has been charged an MUF in a situation where the consumer contends that he/she has not authorized such a charge and has not utilized the service. MCI shall continue to instruct its customer service representatives to credit consumers who advise MCI that they have been charged an MUF without having authorized MCI to provide long distance service, unless there is evidence that the customer continues to utilize the service. MCI shall utilize commercially reasonable good faith efforts to identify, locate and, where appropriate, provide credits or refunds to consumers who have previously made complaints regarding the imposition of MUF fees, if they have not already received credits or refunds in connection with such complaints. MCI notes that it has credited 74 of the 77 consumers referenced in the OII. MCI estimates that it has credited in excess of $1 million to date to California consumers in connection with MUF billing issues.

27.     Pursuant to this policy, over 90% of persons who have complained about long distance plan or minimum fees have received credits during the period commencing with the first quarter of 2003 through the second quarter of 2005. MCI commits to review, in all cases where sufficient records exist, the complaints of those remaining earlier complainants who did not

receive credits during the time period referenced above, and issue credits to any persons so entitled pursuant to MCI's liberal credit policy.

### III. MONETARY PAYMENT

28. Pursuant to Public Utilities Code 2107 and 2108 and the California Public Utility Commissions Rules of Practice and Procedure 51, MCI and the CPSD have agreed upon a combination of consumer credits and a payment to the State General Fund. In addition to MCI's estimate that over $1 million has already been credited to California consumers, MCI shall contribute $2.3 million to the General Fund. This $2.3 million financial payment will be reduced on a dollar for dollar basis for all MUF billing credits or refunds issued by MCI to California consumers from October 1, 2005 until May 31 2007, up to a ceiling of $1 million (the "MUF Credits"). MCI will make a payment of $1.3 million to the General Fund within 30 days after the Commission's approval of this Agreement. No later than September 30, 2007, MCI shall provide an accounting to the CPSD of the amount of the MUF Credits, and shall make a payment to the General Fund of any difference between $1 million and the amount of the MUF Credits (if the MUF Credits are less than $1 million). If the amount of the MUF Credits equals or exceeds the sum of $1 million, MCI will not be required to make any further payment to the General Fund.

### IV. DISMISSAL AND SETTLEMENT

29. <u>Scope and Effect of Agreement</u>. This Agreement represents a full and final resolution of the OII, and the matters giving rise thereto, including, but not limited to, all potential claims, penalties, enforcement actions or investigations relating to complaints of California consumers from June 2002 to present that they were charged an MUF without

authorization.  If the Commission does not approve this Agreement in full, it shall have no force and effect.

30.    No Waiver.  By entering into this Agreement, MCI does not waive its right to contest the extent of the Commission's jurisdiction or authority to impose any requirement of this Agreement in any other proceeding.

31.    Other Proceedings.  The Parties agree that neither the Joint Statement of Case nor anything contained in this Agreement constitutes a binding admission or concession in any other proceeding.  The parties have entered into this Agreement to effect a compromise and settlement of the contested matters pending before the Commission.

V.    GENERAL TERMS

32.    Severability.  No individual term of this Agreement is assented to by any party except in consideration of the Parties' assent to all other terms.  Thus, the Agreement is indivisible and each part is interdependent on each and all other parts. Any party may withdraw from this Agreement if the Commission modifies, deletes from, or adds to the disposition of the matters stipulated herein.  The Parties agree, however, to negotiate in good faith with regard to any Commission-ordered changes in order to restore the balance of benefits and burdens, and to exercise the right to withdraw only if such negotiations are unsuccessful.

33.    Successors.  This Agreement and all covenants set forth herein shall be binding upon and shall inure to the benefit of the respective Parties hereto, their successors, heirs, assigns, partners, representatives, executors, administrators, subsidiary companies, divisions, units, agents, attorneys, officers, and directors.

34.    Knowing and Voluntary Execution.  The Parties acknowledge each has read this Agreement, that each fully understands the rights, duties and privileges created hereunder, and

11

that each enters this Agreement freely and voluntarily. Each Party further acknowledges that it has had the opportunity to consult with counsel and discuss the provisions hereof and the consequences of signing this Agreement, and that each Party or their counsel have made such investigation of the facts and law pertaining to the matters herein as they deem necessary, and that they have not relied and do not rely upon any statement, promise or representation by any other party or its counsel, whether oral or written, except as specifically set forth in this Agreement.

35.    Authority to Execute Agreement. The undersigned acknowledge and covenant that they have been duly authorized to execute this Agreement on behalf of their respective principals and that such execution is made within the course and scope of their respective agency or employment.

36.    Entire Agreement. The Parties expressly acknowledge that the consideration recited in this Agreement is the sole and only consideration of this Agreement, and that no representations, promises, or inducements have been made by the Parties or any director, officer, employee, or agent thereof other than as set forth expressly in this Agreement.

37.    No Waiver or Modification. This Agreement constitutes the entire agreement between the Parties and no terms herein may be waived, modified or amended, except in a writing signed by both Parties. Either party may petition the Commission for a modification of this Agreement in the event of: 1) an order from a court or agency in conflict with a provision or provisions of this Agreement; 2) a change of law rendering performance of a provision or provisions of this Agreement impracticable; or 3) a change in circumstances rendering the maintenance of some or all of the improvements referenced in Part II of the Agreement moot.

38.    "Sunset" Clause.    MCI's obligations as set forth in paragraphs 21, 26 and 27 of this Agreement shall expire two years from the effective date of this Agreement.

39.    Choice of Law.    This Agreement shall be governed by and interpreted in accordance with the laws of the State of California and the rules, regulations and General Orders of the California Public Utilities Commission.

40.    Execution in Counterparts.    This Agreement may be executed by any of the Parties in counterparts with the same effect as if all Parties had signed one and the same document. All such counterparts shall be deemed to be an original and shall together constitute one and the same Agreement. A signature transmitted by facsimile shall be regarded as an original signature.

MCI, INC. AND AFFILIATES

Dated: 10/3/05

Maureen F. Del Duca
MCI, Inc.
1133 Nineteenth Street, N.W.
Washington, D.C. 20036

CONSUMER PROTECTION AND
SAFETY SERVICES DIVISION

Dated:

Rich Clark
Director of Consumers Protection and
 Safety Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102

13

38.     "Sunset" Clause.  MCI's obligations as set forth in paragraphs 21, 26 and 27 of this Agreement shall expire two years from the effective date of this Agreement.

39.     Choice of Law.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of California and the rules, regulations and General Orders of the California Public Utilities Commission.

40.     Execution in Counterparts.  This Agreement may be executed by any of the Parties in counterparts with the same effect as if all Parties had signed one and the same document.  All such counterparts shall be deemed to be an original and shall together constitute one and the same Agreement.  A signature transmitted by facsimile shall be regarded as an original signature.

MCI, INC. AND AFFILIATES

Dated: _____

                              Maureen F. Del Duca
                              MCI, Inc.
                              1133 Nineteenth Street, N.W.
                              Washington, D.C.  20036

                              CONSUMER PROTECTION AND
                              SAFETY SERVICES DIVISION

Dated: _10/3/05_____

                              Richard W. Clark
                              Director of Consumers Protection and
                                 Safety Division
                              California Public Utilities Commission
                              505 Van Ness Avenue
                              San Francisco, CA  94102

Dated:    10/3/05

Travis T. Foss
Staff Counsel
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102

## APPENDIX A

### RESPONDENTS

- **Entity Name**: MCI Worldcom Network Services, Inc. (U-5011-C) f/k/a Worldcom Network Services, Inc. (U-5278) and MCI Telecommunications Corporation (U-5011-C)

- **Corporate Address**: 1133 19th Street NW, Washington, DC 20036

- **Corporate Officers**: Michael D. Capellas, Chairman, CEO and President

- **Corporate Status and Date**: Active, MCI Worldcom Network Services, Inc. is a Delaware corporation. The company's corporate identification number is C0675788. In May 1999 MCI Worldcom Network Services, Inc. filed a name change with the California Secretary of State.

- **Agent for Service of Process**: The Prentice-Hall Corporate System, Inc. 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833.

- **CPU Authority**: Commission Decision 84-01-037 granted MCI Telecommunications authority to provide IntraLATA services; Commission Decision 87-03-066 granted Commission Decision 92-06-064 authorized the merger of WTG-West, Inc. and WTG of California, Inc. into Wil-Tel, Inc. [2]; gave Worldcom Network Services, Inc. authorization to provide InterLATA and IntraLATA interexchange services to other carriers[3]; Commission Decision 90-82-012 gave MCI Telecommunications Corporation authority to operate in California as an Interexchange Company (IEC), providing InterLATA and IntraLATA interexchange services to California customers.

- **Assigned Utility No.**: U-5278-C and U-5011-C [IEC].

- **Services Provided**: InterLATA and IntraLATA Interexchange services to other carriers; InterLATA and IntraLATA interexchange Reseller.

- **Parent Company**: MCI.

- **Entity Name**: MCI Worldcom Communications, Inc. f/k/a Worldcom Technologies, Inc. (U-5378-C) & MCI Telecommunications Corporation (U-5011-C).

---

[2]  CPUC number U-5278-C was assigned to Wil-Tel; see Advice Letter No. 18 re: the proposed transfer of control of Wil-Tel to LDDS Communications, Inc.; see Advice No. 28 re: the corporation's name change from Wil-Tel, Inc. to Worldcom Network Services, Inc. d/b/a Wil-Tel Network Services, Inc.; see Advice Letter 45 re: Worldcom Network Services, Inc. cancellation of its fictitious name d/b/a Wil-Tel Network Services.

[3]  See MCI Worldcom, Inc. 1999 Affiliate Transaction Report.

- **Corporate Officers**: Michael D. Capellas, Chairman, CEO and President.

- **Corporate Status and Date**: Active, MCI Worldcom Network Services, Inc. is a Delaware corporation, having filed a name change with the California Secretary of Sate in May 1999. California corporate identification number is C01929907.

- **Agent for Service of Process**: CSC-Lawyers Incorporating Service, 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833.

- **CPUC Authority**: Commission Decision 84-01-037 granted MCI Telecommunications authority to provide IntraLATA services; Commission Decision 94-03-083 authorized the merger of MidAmerican Communications Corporation, Advanced Telecommunications Corporation and Dial-Net, Inc. into and with LDDS Communications, Inc. [4]; Commission Decision 98-08-068 granted approval of Worldcom, Inc. and MCI Communications, Inc. to merge.

- **Assigned Utility No.**: U-5378-C [CLR, IEC].

- **Services Provided**: InterLATA and IntraLATA Interexchange services. [5]

- **Parent Company**: MCI.

---

[4]  CPUC number U-5378-C was assigned to LDDS MetroMedia Communications, the surviving named entity; see Advice Letter No. 5 re: proposed transfer of control of Wil-Tel to LDDS Communications, Inc.; see Advice Letter No. 14 re: corporate name change from LDDS Communications, Inc. d/b/a LDDS Metro Media Communications to Worldcom, Inc. d/b/a LDDS Worldcom; see Advice Letter No. 37 re: the cancellation of trade name LDDS Worldcom.

[5]  See Worldcom, Inc. 2001 Affiliate Transaction Report, California Annual Report-Attachment B.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of **"JOINT MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT"** in **I.05-04-018** by using the following service:

[ x ] **E-Mail Service:** sending the entire document as an attachment to all known parties of record who provided electronic mail addresses.

[ x ] **U.S. Mail Service:** mailing by first-class mail with postage prepaid to all known parties of record who did not provide electronic mail addresses.

Executed on October 3, 2005 at San Francisco, California.

Halina Marcinkowski

## N O T I C E

Parties should notify the Process Office, Public Utilities Commission, 505 Van Ness Avenue, Room 2000, San Francisco, CA 94102, of any change of address and/or e-mail address to insure that they continue to receive documents. You must indicate the proceeding number on the service list on which your name appears.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CALIFORNIA PUBLIC UTILITIES COMMISSION - SERVICE LISTS          Page 1 of 2

# CALIFORNIA PUBLIC UTILITIES COMMISSION
## Service Lists

Proceeding: I0504018 - CPUC - MCI, WORLDCOM
Filer: CPUC - MCI, WORLDCOM
List Name: LIST
Last changed: September 19, 2005

Download the Comma-delimited File
About Comma-delimited Files

Back to Service Lists Index

## Appearance

MICHELLE M. COTTER
ATTORNEY AT LAW
MCI
1133 19TH STREET, NW
WASHINGTON, DC  20036

CHARLES P. SCHEELER
DLA PIPER RUDNICK GRAY CARY US, LLP
6225 SMITH AVENUE
BALTIMORE, MD  21209-3600

TRAVIS T. FOSS
ATTORNEY AT LAW
CALIFORNIA PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102

## Information Only

MICHAEL SHAMES
ATTORNEY AT LAW
UTILITY CONSUMERS' ACTION NETWORK
3100 FIFTH AVENUE, SUITE B
SAN DIEGO, CA  92103

ELAINE M. DUNCAN
ATTORNEY AT LAW
VERIZON CALIFORNIA INC.
711 VAN NESS AVENUE, SUITE 300
SAN FRANCISCO, CA  94102

MARCEL HAWIGER
ATTORNEY AT LAW
THE UTILITY REFORM NETWORK
711 VAN NESS AVENUE, SUITE 350
SAN FRANCISCO, CA  94102

BARRY ROSS
EXECUTIVE VICE PRESIDENT
CALIFORNIA TELEPHONE ASSOCIATION
1851 HERITAGE LN STE 255
SACRAMENTO, CA  95815-4923

CALIFORNIA PUBLIC UTILITIES COMMISSION - SERVICE LISTS                Page 2 of 2

THE PRENTICE-HALL CORPORATION SYSTEM INC
SUITE 100
2730 GATEWAY OAKS DRIVE
SACRAMENTO, CA  95833

## State Service

LOS ANGELES DOCKET OFFICE
CALIFORNIA PUBLIC UTILITIES  COMMISSION
320 W. 4TH STREET, SUITE 500
LOS ANGELES, CA  90013

CYNTHIA WALKER
CALIF PUBLIC UTILITIES COMMISSION
CONSUMER PROTECTION AND SAFETY DIVISION
ROOM 2203
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3214

JANEEN L LONG
CALIF PUBLIC UTILITIES COMMISSION
UTILITY & PAYPHONE ENFORCEMENT
ROOM 2-E
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3214

RICHARD CLARK
CALIF PUBLIC UTILITIES COMMISSION
CONSUMER PROTECTION AND SAFETY DIVISION
ROOM 2205
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3214

SARAH R THOMAS
CALIF PUBLIC UTILITIES COMMISSION
DIVISION OF ADMINISTRATIVE LAW JUDGES
ROOM 5105
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3214

**Top of Page**
**Back to INDEX OF SERVICE LISTS**

# EXHIBIT J

1  Grant Woods (AZ Bar No. 006106)
   **GRANT WOODS, PC**
2  1726 North Seventh Street
   Phoenix, Arizona 85006
3  Telephone: (602) 258-2599
   Facsimile: (602) 258-5070
4
   Robert B. Carey (AZ Bar No. 011186)
5  Stephanie Levin Bozzo (AZ Bar No. 018470)
   **HAGENS BERMAN SOBOL SHAPIRO PLLC**
6  2425 E. Camelback Road, Suite 650
   Phoenix, Arizona 85016
7  Telephone: (602) 840-5900
   Facsimile: (602) 840-3012
8
   Daniel C. Girard (admitted *pro hac vice*)
9  A. J. De Bartolomeo
   Aaron M. Sheanin (admitted *pro hac vice*)
10 **GIRARD GIBBS & De BARTOLOMEO LLP**
   601 California Street, Suite 1400
11 San Francisco, California 94108
   Telephone: (415) 981-4800
12 Facsimile: (415) 981-4846

13 Attorneys for Individual and Representative Plaintiff

14

15                  **UNITED STATES DISTRICT COURT**

                        **DISTRICT OF ARIZONA**
16

17 SHARY EVERETT, on behalf of herself and    Case No.  CIV 05-2122-PHX-ROX
   all others similarly situated,
18
                    Plaintiff
19                                             **DECLARATION OF SHARY EVERETT**
                                              **IN OPPOSITION TO MOTION TO**
20        v.                                   **DISMISS**

21
   MCI, INC., a Delaware Corporation,
22
23                  Defendant.

24

25

26

27

28

   ──────────────────────────────────────────────
         DECLARATION OF SHARY EVERETT IN OPP'N TO MOT. TO DISMISS

1    I, Shary Everett, declare as follows:

2    1.    I am over the age of eighteen.  This declaration is based on personal knowledge.

3 If called to testify to the matters stated herein, I could and would do so competently.

4    2.    As alleged in the Class Action Complaint, MCI assessed a monthly minimum

5 usage fee and related charges on my home telephone, (623) 932-9012.  At all relevant times,

6 telephone service on that line has been kept in the name of my husband.  We did not authorize

7 or incur the charges from MCI.  At the time MCI assessed the charges, Qwest was the local

8 service provider for that telephone line, and AT&T was the long distance service provider.

9    3.    At first we did not pay the MCI bill.  Instead, I called MCI to dispute the charges

10 and have them removed.  I informed the MCI customer service representative that we were not

11 MCI customers and requested cancellation of the erroneous charges.  The customer service

12 representative told me that MCI had billed us because we were MCI customers, and that MCI

13 could not cancel our bills.  The MCI customer service representative told me to contact my

14 local service provider to cancel MCI long distance service.  I then called Qwest in an effort to

15 have the MCI billing problem resolved.  The Qwest representative informed me that Qwest had

16 no record that we were MCI customers and that Qwest.

17    4.    MCI continued to send us bills.  We eventually received a collections notice from

18 MCI.  Upon receiving the collections notice I paid the full amount demanded, to prevent MCI

19 from damaging our credit.  I paid the bill from a joint checking account I share with my

20 husband.

21    5.    I understand that MCI has attempted to establish that it issued a credit to Cox

22 Communications, our current telephone carrier, in the amount of $12.00 to cover charges that I

23 paid to MCI.  I also understand that, according to MCI, the credit should have appeared on our

24 September 26, 2005 invoice from Cox Communications.

25    6.    No credit from MCI appears on the bill from Cox Communications for telephone

26 number (623) 932-9012 for the month of September 2005 or October 2005.  True and correct

27 copies of the pertinent pages (those showing charges, payments, adjustments, and balances) of

28

---

DECLARATION OF SHARY EVERETT IN OPP'N TO MOT. TO DISMISS

1

1   those telephone bills are attached to this declaration as Exhibits A and B.

2         7.    On or about May 17, 2006, I contacted Cox Communications.    The Cox

3   Communications customer service representative told me that no credit from MCI had been

4   posted to our account at any time since September 2005.

5         8.    I am familiar with the allegations of the Class Action Complaint.  I retained

6   Girard Gibbs & De Bartolomeo LLP ("Girard Gibbs") to be my counsel and to bring this case

7   as a class action.  I have communicated regularly with attorneys at Girard Gibbs about this case.

8   I have been informed of and understand the duties and responsibilities of a class representative.

9         9.    I am prepared to serve as a class representative.  I believe that my experiences are

10   similar to those of other class members, and that my interests are aligned with those of the

11   class.  Unless this case proceeds as a class action, MCI will keep the money it collected from

12   thousands of other consumers like me who were charged monthly fees despite the fact that they

13   were not MCI customers.

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28

DECLARATION OF SHARY EVERETT IN OPP'N TO MOT. TO DISMISS

2

1    I declare under penalty of perjury under the laws of the United State of America that the

2  foregoing is true and correct.

3    Executed on this 26th day of May, 2006, at Goodyear, Arizona.

4

5

6    Shary Everett

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SHARY EVERETT IN OPP'N TO MOT. TO DISMISS

# EXHIBIT A



COMMUNICATIONS

www.cox.com

August 28, 2005

Account Number: 501 8501 140850801

TOM EVERETT
14377 W ALVARADO DR
GOODYEAR  AZ 85338

Page 1 of 5

| Previous Balance | Payments Received | Adjustments | Current Charges | Total Due | Due By |
|---|---|---|---|---|---|
| $177.58 | $-172.58 | $0.00 | $87.03 | $92.03 | Sep 26, 2005 |

| Current Charges as of August 28, 2005 | |
|---|---|
| Total Cable Services | 17.95 |
| Total High Speed Data Services | 39.95 |
| Total Telephone Services | 24.60 |
| Total Taxes and Surcharges | 4.53 |
| Total Current Charges | $87.03 |

## AMOUNT PAST DUE                          $5.00

**Questions?**
See last page of bill for contact information.

### About Your Account

Save time and a stamp! Sign up for EasyPay and have your monthly Cox bill paid automatically through your bank account (or with a credit card). Sign up online at www.cox.com/easypay or call 623-594-1000. SALES: Mon-Fri, 8 am to 9 pm; Sat & Sun, 8 am to 5 pm. CUSTOMER SERVICE: Mon-Sat, 8 am to 9 pm; Sun, 10 am to 7 pm. REPAIR: 24 hours a day, 7 days a week.

### What's New From Cox

Cox Communications is a leader in the digital age and a company on the forefront of the telecommunications and cable industry. We have great career opportunities currently available. To learn more, click on the Careers link at www.cox.com/phoenix. Be sure to select Arizona if you're searching for jobs within this state.

In addition to getting your favorite cold beverage or filling up your gas tank, you can now pay your Cox bill at Circle K stores. The new Cox ZapLink Payment kiosks are now available to residential and commercial customers in 170

*Continued on Reverse*

COX
COMMUNICATIONS
P.O. BOX 78071
PHOENIX, ARIZONA 85062-8071

Account Number:
501 8501 140850801
Total Due: $92.03.
Payment Due By:
Sep 26, 2005

Please return this portion with your payment

Amount Enclosed $ _____

Allow 7 days for processing. PLEASE include your account number on your check. Make checks payable to Cox Communications. Payment of this bill confirms your subscription to services and possession of equipment as listed.

08501501436140850801400009203

#BWNJNVS
#436ADPHEPHPAS013#
TOM EVERETT
14377 W ALVARADO DR
GOODYEAR AZ 85338-2322

COX COMMUNICATIONS
P.O. BOX 78071
PHOENIX AZ 85062-8071



August 28, 2005

Account Number: 501 8501 140850801

TOM EVERETT

Page 3 of 5

## Payments

| Date | Type | Amount |
|------|------|--------|
| 08/03/05 | PAYMENT RECEIVED | -86.29 |
| 08/24/05 | PAYMENT RECEIVED | -86.29 |
| **Total Payments Received** | | **$-172.58** |

## Cox Cable Service

| | Quantity | Amount |
|---|---|---|
| Monthly Cable Service from Sep 1 to Sep 30 | | |
| COX LIMITED BASIC | | 17.95 |
| *Total Monthly Cable Service* | | *$17.95* |
| *Total Cox Cable Service* | | *17.95* |

## Cox High Speed Data Service

| | Quantity | Amount |
|---|---|---|
| Monthly Internet Service from Sep 1 to Sep 30 | 1 | 39.95 |
| COX HIGH-SPEED INTERNET | | |
| *Total Monthly Internet Service* | | *$39.95* |
| *Total Cox High Speed Data Service* | | *39.95* |

## Cox Digital Telephone Service

Telephone Service for 623-932-9012

| | Quantity | Amount |
|---|---|---|
| Monthly Telephone Service from Sep 1 to Sep 30 | | |
| CALLER ID | 1 | 5.95 |
| BASIC MONTHLY SERVICE | 1 | 11.75 |
| FCC ACCESS CHARGE | 1 | 6.30 |
| *Total Monthly Telephone Service* | | *$24.00* |
| Telephone Usage Charges | | |
| Local DA Calls | 1 | 0.60 |
| *Total Telephone Usage Charges* | | *$0.60* |
| *Total Telephone Service for 623-932-9012* | | *$24.60* |
| *Total Cox Digital Telephone Service* | | *$24.60* |

*Indicates basic or local telephone service charges

# EXHIBIT B



**COX**
COMMUNICATIONS

www.cox.com

September 27, 2005
Account Number: 501 8501 140850801

TOM EVERETT
14377 W ALVARADO DR
GOODYEAR AZ 85338

Page 1 of 5

| Previous Balance | Payments Received | Adjustments | Current Charges | Total Due | Due By |
|---|---|---|---|---|---|
| $92.03 | $-92.03 | $-5.00 | $86.37 | $81.37 | Oct 26, 2005 |

Current Charges as of September 27, 2005
| | |
|---|---|
| Total Cable Services | 17.95 |
| Total High Speed Data Services | 39.95 |
| Total Telephone Services | 24.00 |
| Total Taxes and Surcharges | 4.47 |
| **Total Current Charges** | **$86.37** |

**Questions?**
See last page of bill for contact information.

**About Your Account**
Save time and a stamp! Sign up for EasyPay and have your monthly Cox bill paid automatically through your bank account (or with a credit card). Sign up online at www.cox.com/easypay or call 623-594-1000. SALES: Mon-Fri, 8 am to 9 pm; Sat & Sun, 8 am to 5 pm. CUSTOMER SERVICE: Mon-Sat, 8 am to 9 pm; Sun, 10 am to 7 pm. REPAIR: 24 hours a day, 7 days a week.

**What's New From Cox**
On October 12, 2005, we are making channel changes: TV Guide Channel moves to ch. 97 (from ch. 62); History Channel moves to ch. 62 (from ch. 71). TNT HD is being added on channel 725 for our high definition customers.

Watch your Arizona Cardinals vs. San Francisco 49ers live on ESPN (Ch. 33) from Mexico City, Mexico on October 2nd, 5:30pm-8:30pm.

---



**COX**
COMMUNICATIONS

P.O. BOX 79071
PHOENIX, ARIZONA 85062-9071

Account Number:
501 8501 140850801
Total Due: $81.37
Payment Due By:
Oct 26, 2005

Please return this portion with your payment.

Amount Enclosed $ _____

Allow 7 days for processing. Please include your account number on your check. Make checks payable to Cox Communications. Payment of this bill confirms your subscription to services and possession of equipment as listed.

08501501436140850801420008137

//BWNJNVS
#436ADPHEPHPA5013#
TOM EVERETT
14377 W ALVARADO DR
GOODYEAR AZ 85338-2322

COX COMMUNICATIONS
P.O. BOX 78071
PHOENIX AZ 85062-8071



**COX**
COMMUNICATIONS

September 27, 2005

| Account Number: | 501 8501 140850801 |
| --- | --- |

TOM EVERETT

Page 3 of 5

## Payments

| Date | Type | Amount |
| --- | --- | --- |
| 09/22/05 | PAYMENT RECEIVED | -92.03 |
| | **Total Payments Received** | **$-92.03** |

## Adjustments

| Date | Type | Amount |
| --- | --- | --- |
| 08/30/05 | LATE PAYMENT FEE | -5.00 |
| | **Total Adjustments** | **$-5.00** |

## Cox Cable Service

| | Quantity | Amount |
| --- | --- | --- |
| Monthly Cable Service from Oct 1 to Oct 31 | 1 | 17.95 |
| COX LIMITED BASIC | | |
| *Total Monthly Cable Service* | | *$17.95* |
| Total Cox Cable Service | | 17.95 |

## Cox High Speed Data Service

| | Quantity | Amount |
| --- | --- | --- |
| Monthly Internet Service from Oct 1 to Oct 31 | 1 | 39.95 |
| COX HIGH SPEED INTERNET | | |
| *Total Monthly Internet Service* | | *$39.95* |
| Total Cox High Speed Data Service | | 39.95 |

## Cox Digital Telephone Service

Telephone Service for 623-932-9012

| | Quantity | Amount |
| --- | --- | --- |
| Monthly Telephone Service from Oct 1 to Oct 31 | | |
| CALLER ID | 1 | 5.95 |
| BASIC MONTHLY SERVICE | 1 | 11.75 |
| FCC ACCESS CHARGE | 1 | 6.30 |
| *Total Monthly Telephone Service* | | *$24.00* |
| Total Telephone Service for 623-932-9012 | | $24.00 |
| Total Cox Digital Telephone Service | | $24.00 |

Indicates an Unregulated Telephony Charge