# Exhibit D

1
2
3
4
5
6            IN THE UNITED STATES DISTRICT COURT

7               FOR THE DISTRICT OF ARIZONA

8
9  SHARY EVERETT, on behalf of herself)    No. CV-05-2122-PHX-ROS
   an all other similarly situated,       )
10                                         )    **ORDER**
            Plaintiff,                     )
11                                         )
   v.                                      )
12                                         )
   MCI, INC., a Delaware Corporation,      )
13                                         )
            Defendant.                     )
14                                         )
   _____)
15
16
17         Pending before the Court is Defendant's Motion for Judgment on the Pleadings, or in

18  the Alternative, Motion for Summary Judgment (Doc. #64).  While Defendant has titled its

19  Motion as a Motion for Judgment on the Pleadings, or in the Alternative, Motion for

20  Summary Judgment, Defendant also requests that the Court refer this matter to the

21  Bankruptcy Court.  For the following reasons, the Court will grant Defendant's Motion in

22  part and refer the case to the Bankruptcy Court.

23         Defendant's predecessor, WorldCom, Inc. filed for bankruptcy under Title 11 in July

24  2002.  On October 31, 2003, the Bankruptcy Court issued the confirmation order approving

25  the Bankruptcy Plan (the "Plan"), which became effective in April 2004 (the "Effective

26  Date").  Plaintiff's Complaint alleges that her claims arose in and were liquidated by 2003.

27  Therefore, the parties agree that Plaintiff's claims against the bankruptcy estate are defined

28  as "Administrative Expense Claims" under the Plan.

28 U.S.C. § 157(a) states:

> Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

The U.S. District Court of Arizona has a standing general order which states:

> Pursuant to 28 U.S.C. § 157(a), the court hereby refers to the bankruptcy judges for this district all cases under title 11 and all proceedings under title 11 or arising in or related to a case under title 11 as of the effective date of the present Bankruptcy Act.

General Order 01-15.

Since Plaintiff's claims arose and were liquidated prior to the Effective Date of the Plan, the Plan dictates how those claims must be resolved. The Plan states that the Bankruptcy Court retains exclusive jurisdiction to hear and determine Administrative Expense Claims. Accordingly, this Court must refer those claims to the Bankruptcy Court pursuant to the general order, the Plan and 28 U.S.C. § 157(a).

Plaintiff objects to the referral of this matter to the Bankruptcy Court, arguing that since the case is non-core to Defendant's Bankruptcy, the Bankruptcy Court cannot enter a final binding judgment and may only submit "proposed findings of fact and conclusions of law to the district court." See 28 U.S.C. § 157(c)(1) (stating "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected").

However, whether Plaintiff's claims are classified as core or non-core under 28 U.S.C. § 157(b)(2) is irrelevant at this point, as that determination must be made by the Bankruptcy Court. See 28 U.S.C. § 157(b)(3) (stating that "the bankruptcy judge shall determine . . . .whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title").

1    Accordingly,

2        **IT IS ORDERED THAT** this case is referred to the Bankruptcy Court for further

3    proceedings.

4        **IT IS FURTHER ORDERED** Counsel shall prepare and file a status report every

5    four months commencing September 24, 2007.

6        **IT IS FURTHER ORDERED** the Rule 16 Scheduling Conference set for June 1,

7    2007 at 2:00 P.M. is **VACATED**.

8

9    DATED this 24th day of May, 2007.

10

11

12

13

14    _____

15    Roslyn O. Silver

16    United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

# Exhibit E

1  Grant Woods (AZ Bar No. 006106)
   **GRANT WOODS, PC**
2  1726 North Seventh Street
   Phoenix, Arizona 85006
3  Telephone: (602) 258-2599
   Facsimile: (602) 258-5070
4
   Robert B. Carey (AZ Bar No. 011186)
5  Stephanie Levin Bozzo (AZ Bar No. 018470)
   **HAGENS BERMAN SOBOL SHAPIRO PLLC**
6  2425 E. Camelback Road, Suite 650
   Phoenix, Arizona 85016
7  Telephone: (602) 840-5900
   Facsimile: (602) 840-3012
8
   Daniel C. Girard (admitted *pro hac vice*)
9  Aaron M. Sheanin (admitted *pro hac vice*)
   **GIRARD GIBBS & De BARTOLOMEO LLP**
10 601 California Street, Suite 1400
   San Francisco, California 94108
11 Telephone: (415) 981-4800
   Facsimile: (415) 981-4846
12
   Attorneys for Individual and Representative Plaintiff
13

14              **UNITED STATES DISTRICT COURT**

15                 **DISTRICT OF ARIZONA**

16

17 SHARY EVERETT, on behalf of herself and      Case No.  CIV 05-2122-PHX-ROS
   all others similarly situated,

18              Plaintiff
                                                 **PLAINTIFF'S OPPOSITION TO MOTION**
19        v.                                     **TO DISMISS CLASS ACTION COMPLAINT**

20

21 MCI, INC., a Delaware Corporation,            ORAL ARGUMENT REQUESTED

22

23              Defendant.

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................ 2

III.  ARGUMENT ................................................................................................ 4

    A.    MCI May Not Moot This Class Action By "Picking Off" Plaintiff's Claims. ......... 4

        1.    Ms. Everett Can Still Serve as the Class Representative…………………..…4

        2.    Other Class Members Are Prepared To Represent The Class……………..9

    B.    The Court Should Not Refer This Class Action To The FCC Under The Doctrine Of Primary Jurisdiction ........................................................................................ 9

        1.    Legal Standards Governing Primary Jurisdiction…………………………9

        2.    Agency Expertise Is Not Necessary To Adjudicate The Allegations Of Consumer Fraud In The Complaint…....………………………………11

        3.    The FCC Has No Interest In The Issues Raised In This Case……………13

        4.    There Is No Risk of Inconsistent Rulings……...…………………………14

        5.    The Absence Of A Prior Application To The FCC Weighs Against Referral……………………………………………………………..15

IV.   CONCLUSION............................................................................................. 16

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page(s)**

Ambalu v. Rosenblatt,
194 F.R.D. 451 (E.D.N.Y. 2000)............................................................................7

Anderson v. Farmland Indus.,
45 F. Supp.2d 863 (D. Kan. 1999) .......................................................................11

Arsberry v. Illinois,
244 F.3d 558 (7th Cir. 2001) ..........................................................................10, 12

Association of Am. Med. Colls., v. United States,
217 F.3d 770 (9th Cir. 2000).................................................................................3

AT&T Co. v. FCC,
978 F.2d 727 (D.C. Cir. 1992)..............................................................................14

Bond v. Fleet Bank (RI), N.A.,
C.A. No. 01 -177 L, 2002 U.S. Dist. LEXIS 4131 (D.R.I. Feb. 21, 2002) ...................7

Brown v. MCI Worldcom Network Servs., Inc.,
277 F.3d 1166 (9th Cir. 2002) ........................................................................10, 11

Brunet v. City of Columbus,
1 F.3d 390, 400 (6th Cir. 1993) .............................................................................7

Cellular Dynamics, Inc. v. MCI Telecomm. Corp.,
Case No. 94 C 3126, 1995 U.S. Dist. LEXIS 4798 (N.D. Ill. Apr. 12, 1995) ............12

Deposit Guaranty Nat'l Bank v. Roper,
445 U.S. 326 (1980) .........................................................................................5, 6

Foster v. Carson,
347 F.3d 742 (9th Cir. 2003) .................................................................................4

Franks v. Bowman Transp. Co.,
424 U.S. 747 (1976) .............................................................................................5

Gilmore v. Southwestern Bell Mobile Systems, L.L.C.,
210 F.R.D. 212 (N.D. Ill. 2001) ......................................................................11, 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Goya Foods, Inc. v. Tropicana Prods., Inc.,
846 F.2d 848 (2d Cir. 1988) ............................................................................................10

Indiana Bell Tel. Co. v. Ward,
Case No. IP 02-170-C H/K, 2002 U.S. Dist. LEXIS 26013 (S.D. Ind. Dec. 6, 2002) ................12

Kuahulu v. Employers Ins. of Wausau,
557 F.2d 1334 (9th Cir. 1977) ...........................................................................................5

Labora v. MCI Telecomm. Corp.,
Case No. 98-1073-CIV-HIGHSMITH (S.D. Fla. July 20, 1998) ......................................8

Liles v. American Corrective Counseling Servs., Inc.,
201 F.R.D. 452 (S.D. Iowa 2001) ......................................................................................8

Lipton v. MCI WorldCom, Inc.,
135 F. Supp.2d 182 (D.D.C. 2001) ...................................................................................14

Lusardi v. Xerox Corp.,
975 F.2d 964 (3d Cir. 1992) ...............................................................................................7

Manson v. MCI, Inc.,
Case No 04-73374 (E.D. Mich. Feb. 24, 2005),
appeal docketed, No. 05-1515 (6th Cir. Apr. 26, 2005) .....................................................8

MCI Telecomm. Corp. v. John Mezzalingua Assocs.,
921 F. Supp. 936 (N.D.N.Y. 1996) ...........................................................................10, 15

Mississippi Power & Light Co. v. United Gas Pipe Line Co.,
532 F.2d 412 (5th Cir. 1976) ...........................................................................................11

Nadar v. Allegheny Airlines, Inc.,
426 U.S. 290 (1976) ....................................................................................................10, 12

Nasca v. GC Servs. Ltd. P'ship.,
01 Civ. 10127 (DLC), 2002 U.S. Dist. LEXIS 16992 (S.D.N.Y. Sep. 13, 2002) ........................7

National Comms. Ass'n v. AT&T Co.,
46 F.3d 220 (2d Cir. 1995) ..............................................................................................10

RCA Global Comms., Inc. v. Western Union Tel. Co.,
521 F. Supp. 998 (S.D.N.Y. 1981) ..................................................................................14

<u>Towne Reader Serv., Inc. v. MCI Telecomm. Corp.</u>,
91-CV-115S, 1992 U.S. Dist. LEXIS 13569 (W.D.N.Y. Aug. 11, 1992) ................................. 12

<u>Redding v. MCI Telecomm. Corp.</u>,
No. C-86-5498-CAL, 1987 U.S. Dist. LEXIS 16073 (N.D. Cal. Sep. 29, 1987) ....................... 12

<u>Schaake v. Risk Management Alternatives, Inc.</u>,
203 F.R.D. 108 (S.D.N.Y. 2001) .................................................................................................. 7

<u>Southwestern Bell Tel. Co. v. FCC</u>,
138 F.3d 746 (8th Cir. 1998) ..................................................................................................... 14

<u>Steffel v. Thompson</u>,
415 U.S. 452 (1974) ..................................................................................................................... 4

<u>Susman v. Lincoln Am. Corp.</u>,
587 F.2d 866 (7th Cir. 1978) ....................................................................................................... 6

<u>The Bleakley No. 76</u>,
56 F.2d 1037 (S.D.N.Y. 1932) ..................................................................................................... 8

<u>The Bruss Co. v. Allnet Comm. Servs., Inc.</u>,
606 F. Supp. 401 (N.D. Ill. 1985) .............................................................................................. 12

<u>United States v. McDonnell Douglas Corp.</u>,
751 F.2d 220 (8th Cir. 1984) ................................................................................................ 10, 11

<u>Weiss v. Regal Collections</u>,
385 F.3d 337 (3d Cir. 2004) ............................................................................................... 5, 6, 7, 8

<u>Wilner v. OSI Collection Servs., Inc.</u>,
198 F.R.D. 393 (S.D.N.Y. 2001) ................................................................................................. 7

<u>Zeidman v. J. Ray McDermott & Co.</u>,
651 F.2d 1030 (5th Cir. 1981) ..................................................................................................... 7

## **STATUTES**

Fed. R. Civ. P. 12(b)(1) ............................................................................................................... 1

Fed. R. Civ. P. 23 ................................................................................................................. 6, 7, 9

Fed. R. Civ. P. 68 .................................................................................................................... 6, 7

## OTHER AUTHORITIES

In the Matter of Rules and Regulations Implementing Minimum Customer
Account Record Exchange Obligations on All Local and Interexchange Carriers,
FCC Docket No. 02-386.................................................................................................. 13

Preventing Defendants From Mooting Class Actions By Picking Off Named Plaintiffs,
David Hill Koysza, 53 Duke L.J. 781 (Nov. 2003)....................................................... 8

Administrative Law Treatise,
Kenneth Culp Davis & Richard J. Pierce Jr., § 14.6 ................................................. 14

# I.    INTRODUCTION

Plaintiff Shary Everett opposes the motion of Defendant MCI, Inc. ("MCI") under Rule 12(b)(1) to dismiss for lack of jurisdiction.  Ms. Everett alleges that MCI billed her and other consumers for charges they never incurred.  She pleads that MCI used data it purchased from local exchange carriers ("LECs") to identify consumers and send them bills for charges they had never authorized.

Defendant's motion raises two issues.  The first is whether MCI can deliberately moot the named plaintiff's claim by crediting her account after the case was filed.  The second is whether this case falls within the primary jurisdiction of the FCC.

Courts generally reject attempts to "pick off" class representatives.  Allowing a defendant to eliminate the named plaintiff's claim but ignore the claims of class members would make it impossible for a class action to proceed to judgment.  Crediting Shary Everett does not change the fact that MCI has collected unauthorized charges from thousands of other consumers.  The controversy identified in Ms. Everett's complaint is a class controversy, not an individual one, as the accompanying declarations of class members who attest to their willingness to serve as class representatives confirm.  The Court should reject MCI's attempt to evade its jurisdiction by mooting the named plaintiff's claim.

MCI's "Plan B" for escaping this Court's jurisdiction is a motion to refer this matter to the Federal Communications Commission ("FCC") under the doctrine of primary jurisdiction.  To support its arguments, MCI mischaracterizes Plaintiff's theory of liability.  MCI suggests the charges at issue result from problems in the exchange of customer information between MCI and Ms. Everett's LEC.  MCI argues that this case will require an examination by the FCC of "the manner in which LECs and long distance carriers ('IXCs') exchange information," and "the rules that apply to the exchange of information between IXCs and the LECs."  Mot. To Dismiss at 13.

This case is not about errors in the exchange of billing data between telephone companies.  Plaintiff's case arises out of the business decisions made by MCI to misuse the data it received from the LECs.  Internal MCI documents available as a matter of public record

1   following a California Public Utilities Commission ("CPUC") proceeding give insight into the

2   corporate decision making process that led MCI to impose the unauthorized charges.  These

3   documents show that MCI expected to capture an immediate $24.6 million in additional

4   revenue and projected an "IRR" (internal rate of return) of 3,662% from its scheme to enroll

5   non-customers in MCI calling plans.  No specialized agency expertise is needed to determine if

6   MCI's use of LEC data to establish accounts for "zero-usage" customers and send them bills

7   for monthly "minimum usage fees" is lawful.  The Court is fully competent to adjudicate the

8   claims alleged in the Complaint.

9                          **II.    BACKGROUND**

10          On July 17, 2005, Shary Everett filed her Complaint, alleging that long-distance carrier

11  MCI crafted and implemented a scheme to bill non-customers a monthly service charge

12  (referred to as a "minimum usage fee" or "MUF").  Ms. Everett terminated long-distance service

13  with MCI in 1999.  See Complaint, ¶ 24.  Beginning in February 2003, MCI billed her for an

14  MUF.  See id., ¶ 25.  Ms. Everett was not a customer at the time MCI assessed the charges.  She

15  did not authorize the charges.  See id., ¶¶ 24-25.  Despite Ms. Everett's efforts, MCI refused to

16  reverse or remove the unauthorized charges.  See id., ¶ 26.  Plaintiff subsequently received a

17  collections notice for her failure to pay the unauthorized charges.  See id., ¶ 27.  Plaintiff

18  eventually paid the unauthorized charges and cancelled her long-distance service with AT&T to

19  prevent MCI from continuing to bill her.  See id., ¶ 28.  At the time Plaintiff filed the

20  Complaint, MCI had not refunded the unauthorized charges.  See id., ¶ 29.

21          According to MCI, on September 6, 2005, seven weeks after Plaintiff filed the

22  Complaint, MCI transmitted a credit of $12.00 to Cox Communications in an effort to "fully

23  compensate Ms. Everett for the charges that she paid to MCI plus interest."  Affidavit of

24  Amanda L. Childs, ¶ 11.  MCI does not claim to have ended its practice of assessing the MUF.

25  MCI has not expressed any intention of reimbursing the other people who were improperly

26  assessed the MUF or instructing the credit scoring agencies to delete any adverse notations on

27  the credit reports of the consumers who refused to pay the MUF.

28

1    As alleged in the Complaint and confirmed by documents made available in the CPUC

2    proceeding, MCI purchases electronic data from LECs to identify telephone lines that are

3    assigned to MCI for long-distance service. See Complaint, ¶¶ 8-10; see also Declaration of

4    Aaron M. Sheanin In Opposition To Motion To Dismiss Class Action Complaint ("Sheanin

5    Decl.")[1] (Ex. A at 4). The data MCI purchases from the LECs is dated and unreliable. Many of

6    the persons ultimately billed have terminated service and are no longer customers of MCI.

7    Others were never MCI customers in the first place, but were instead assigned a number

8    previously assigned to an MCI customer. See Complaint, ¶ 11. MCI nevertheless uses LEC

9    data to create a new account for the "end user" associated with the line and enrolls the end user

10   in an MCI "calling plan" (the "Basic Dial-1" plan) which provides for an MUF. See id., ¶ 14.

11   MCI makes no attempt to contact consumers to verify that they are or wish to be MCI long-

12   distance customers or check its own records to determine whether the consumers previously

13   terminated or attempted to cancel MCI long-distance service. See id., ¶ 13. MCI then bills

14   these individuals, either directly or through the LEC, for an MUF and related charges for each

15   line PIC'd to MCI. See id., ¶ 18. Many consumers inadvertently pay the charges. Others who

16   dispute the charges encounter difficulties in obtaining adjustments. See id., ¶¶ 21-22. MCI has

17   also referred consumers' unpaid charges to collections agencies. See id., ¶ 22.

18   An internal MCI document entitled "Business Case Write-Up" demonstrates that MCI

19   implemented the MUF solely as a means of extracting additional revenue. See id., ¶ 16.

20   According to the document, MCI could "generate an additional $24.6M in revenue through the

21   application of the new $3 minimum usage fee." Id. The document explains that MCI rejected

22   the alternative of not implementing the MUF because "it unnecessarily avoids a significant

23   source of additional revenue." Id. MCI anticipated that the MUF would affect 3.3 million

24   consumers. See Sheanin Decl. (Ex. C). According to internal MCI e-mails, MCI projected an

25   internal rate of return of 3,662% from the imposition of the MUF. See Sheanin Decl. (Ex. D).

26

27   [1]   The Court may consider affidavits or other evidence on a motion to dismiss for lack of

28   subject matter jurisdiction. See Association of Am. Med. Colls., v. United States, 217 F.3d 770,
     778 (9th Cir. 2000).

On April 21, 2005, the CPUC issued an Order Instituting Investigation ("OII") which accused MCI of using the LEC data to establish accounts and default "calling plans" for consumers who had requested that MCI terminate their long-distance service or who were never MCI customers in the first place.  (Ex. A at 1-2).  The point of establishing the accounts and enrolling consumers in calling plans without their consent was to charge them a "minimum usage fee," despite the fact they had "zero-usage" on the MCI network.   See id. (Ex. A at 1-2).  According to the CPUC's Investigative Report Of MCI, the OII was based upon more than 200 consumer complaints and supported by 77 declarations of consumers aggrieved by MCI.  See Sheanin Decl. (Ex. B at 1-2).

On September 30, 2005, MCI and the CPUC jointly moved to settle the CPUC's investigation.  See Sheanin Decl. (Ex. E).  As described in the Settlement Agreement, MCI acknowledges that:  (1) it had charged an MUF to consumers who had contacted MCI to cancel long-distance service, unless MCI also received confirmation from a LEC that the consumer had cancelled; and (2) upon receiving data from a LEC, MCI created a new account for a consumer on a telephone line for which no account existed previously.  See id. (Ex. E, ¶¶ 13, 19, 24).  MCI agreed to contribute $2.3 million to the California State General Fund and to reimburse California consumers who lodge complaints with MCI.  See id. (Ex. E, ¶ 28).

### III.    ARGUMENT

**A.    MCI May Not Moot This Class Action By "Picking Off" Plaintiff's Claims**

MCI submits evidence that it has credited Ms. Everett's current telephone carrier for the charges she paid to MCI plus interest.  MCI claims Ms. Everett's claims are now moot and she cannot proceed on behalf of the Class.  MCI claims to have successfully used this approach in two other class actions.

### 1.    Ms. Everett Can Still Serve as the Class Representative

Under Article III of the U.S. Constitution, a live controversy must exist throughout the litigation.  See Steffel v. Thompson, 415 U.S. 452, 459 n.12 (1974).  An action becomes moot and must be dismissed if the controversy is resolved after the action has been filed.  See Foster v. Carson, 347 F.3d 742, 747 (9th Cir. 2003).  "[A] class action is not automatically moot

1   because the named representative's claim is moot." <u>Kuahulu v. Employers Ins. of Wausau</u>, 557

2   F.2d 1334, 1336 (9th Cir. 1977). "The Supreme Court has emphasized that the application of the

3   mootness doctrine, to a large extent, depends on the idiosyncrasies of each case in which it is

4   applied." <u>Id.</u> (citing <u>Franks v. Bowman Transp. Co.</u>, 424 U.S. 747, 755 (1976)). The mootness

5   doctrine "does not require an automatic dismissal in every case where the district court has

6   failed to certify the class before the representative's claim has become moot." <u>Id.</u>

7   The Supreme Court views attempts by defendants to pick off named plaintiffs as a threat

8   to the integrity of the class action procedure. In <u>Deposit Guaranty Nat'l Bank v. Roper</u>, 445

9   U.S. 326 (1980), the Supreme Court explained that a defendant's attempt "to 'buy off' the

10  individual private claims of the named plaintiffs would be contrary to sound judicial

11  administration." <u>Id.</u> at 339. The Court continued: "Requiring multiple plaintiffs to bring

12  separate actions, which effectively could be 'picked off' by a defendant's tender of judgment

13  before an affirmative ruling on class certification could be obtained, obviously would frustrate

14  the objectives of class actions; moreover it would invite waste of judicial resources by

15  stimulating successive suits brought by others claiming aggrievement." <u>Id.</u>

16  The Third Circuit recently concluded that "allowing the defendants here to 'pick off' a

17  representative plaintiff with an offer of judgment less than two months after the complaint is

18  filed may undercut the viability of the class action procedure, and frustrate the objectives of this

19  procedural mechanism for aggregating small claims." <u>Weiss v. Regal Collections</u>, 385 F.3d

20  337, 344 (3d Cir. 2004). Weiss brought a class action seeking statutory damages and

21  declaratory and injunctive relief for violation of the Fair Debt Collections Practices Act. <u>See</u> <u>id.</u>

22  at 339. Six weeks after Weiss filed his amended complaint, and before the defendants filed an

23  answer or Weiss filed a motion for class certification, the defendants made an offer of judgment

24  ///

25  ///

26  ///

27  ///

28

to Weiss under Rule 68 of the Federal Rules of Civil Procedure[2] for the maximum amount of statutory damages plus attorneys' fees and costs.  See id.  The offer of judgment provided no declaratory or injunctive relief and no relief to the class.  See id. at 339-40.  After Weiss declined the offer of judgment, the district court granted the defendants' motion to dismiss the action as moot.  See id. at 340.

The Third Circuit reversed, holding that the defendants' offer of judgment, which provided complete relief to Weiss but no relief to the class, would not be given effect.  See Weiss, 385 F.3d 337.  According to the Court, allowing the defendant to make an offer of judgment to a named plaintiff prior to class certification would undermine the purposes of Rule 23.  See id. at 345 ("Allowing defendants to 'pick off' putative lead plaintiffs contravenes one of the primary purposes of class actions – the aggregation of numerous similar (especially small) claims in a single action.  [¶]  Moreover, a rule allowing plaintiffs to be 'picked off' at an early stage in a putative class action may waste judicial resources by 'stimulating successive suits brought by others claiming aggrievement.'") (quoting Roper, 445 U.S. at 339).  The Third Circuit cited substantial precedent for the proposition that a class action would not be moot if a trial court lacked the opportunity to rule on a pending motion for class certification when a defendant made an offer of judgment.  See id. at 346 (citing Susman v. Lincoln Am. Corp., 587 F.2d 866, 869-71 (7th Cir. 1978); Zeidman v. J. Ray McDermott & Co., 651 F.2d 1030, 1051 (5th

---

[2] Rule 68 provides:

> At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer with costs then accrued.  If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment.  An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs.  If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.

Fed. R. Civ. P. 68.

Cir. 1981); <u>Lusardi v. Xerox Corp.</u>, 975 F.2d 964, 975 (3d Cir. 1992)).  The court concluded that even though the plaintiff had not moved for class certification, an offer of judgment to a named plaintiff in a class action would be not given effect, provided the plaintiff had not unduly delayed moving for certification.  <u>See id.</u> at 348.  As Weiss could not have been expected to move for class certification less than six weeks after filing his amended complaint, the Third Circuit remanded the class action to the trial court to allow him to file such a motion.  <u>See id.</u> at 348 & n.18.

Prior to the decision in <u>Weiss</u>, some courts adopted the view that an offer of judgment to the named plaintiff would defeat the named plaintiff's individual claims, unless a motion for class certification had already been filed.  <u>See</u>, <u>e.g.</u>, <u>Ambalu v. Rosenblatt</u>, 194 F.R.D. 451 (E.D.N.Y. 2000); <u>Wilner v. OSI Collection Servs., Inc.</u>, 198 F.R.D. 393 (S.D.N.Y. 2001); <u>Brunet v. City of Columbus</u>, 1 F.3d 390, 400-01 (6th Cir. 1993).  The majority of courts and legal scholars addressing the issue have agreed with the Third Circuit, however, and held that absent undue delay on the plaintiff's part in moving for class certification, a defendant may not moot a class action by picking off the claims of the named plaintiff.  <u>See</u>, <u>e.g.</u>, <u>Schaake v. Risk Management Alternatives, Inc.</u>, 203 F.R.D. 108 (S.D.N.Y. 2001) (refusing to allow a defendant to moot a class action by making an offer of judgment to the named plaintiff 32 days after the filing of the complaint and before the filing of a motion for class certification:  "Taken to its absurd logical conclusion, the policy urged by defendant . . . would also allow defendants to essentially opt-out of Rule 23, by allowing a defendant to avoid liability for class wide relief, which could be prevented by the mere service of a Rule 68 offer at the outset of the case."); <u>Nasca v. GC Servs. Ltd. P'ship.</u>, 01 Civ. 10127 (DLC), 2002 U.S. Dist. LEXIS 16992, at *9 (S.D.N.Y. Sep. 13, 2002) (offer of judgment made less than two months after defendant filed its answer:  "To allow a Rule 68 offer to moot a named plaintiff's claim in these circumstances would encourage defendants to pick off named plaintiffs in the earliest stage of the case."); <u>Bond v. Fleet Bank (RI), N.A.</u>, C.A. No. 01 -177 L, 2002 U.S. Dist. LEXIS 4131, at *21-22 (D.R.I. Feb. 21, 2002) ("To permit Fleet to intentionally moot Bond's claims, before Bond had an opportunity to move for class certification, in an effort to avoid a class action, would do

violence to the interests of justice."); Liles v. American Corrective Counseling Servs., Inc., 201 F.R.D. 452, 455 (S.D. Iowa 2001) ("Hinging the outcome of this motion [to dismiss as moot following offer of judgment] on whether or not class certification has been filed is not well-supported in the law nor sound judicial practice; it would encourage a 'race to pay off' named plaintiffs very early in litigation, before they file motions for class certification."); David Hill Koysza, Preventing Defendants From Mooting Class Actions By Picking Off Named Plaintiffs, 53 Duke L.J. 781, 781-82 (Nov. 2003) (an offer of judgment to named plaintiffs before class certification "both thwarts the function of the class action device and vitiates the policies behind it").

MCI credited Ms. Everett only seven weeks after she filed her Complaint.  MCI had not answered or even moved against the Complaint, and Plaintiff has not had a reasonable opportunity to move for class certification.  MCI has not offered to compensate the remaining class members or agreed to implement declaratory and injunctive relief sought by Plaintiff.

As the Weiss court explained, "the class action process should be able to 'play out' according to the directives of Rule 23 and [the Court] should permit due deliberation by the parties and the court on the class certification issues."  Weiss, 385 F.3d at 348.  Although the Ninth Circuit has not opined on this issue, the Third Circuit's decision in Weiss is the authority most directly applicable to this case.  Accordingly, this Court should follow the precedent of the Third Circuit.  See The Bleakley No. 76, 56 F.2d 1037, 1038 (S.D.N.Y. 1932) (a district court is bound to follow a decision of the Court of Appeals of another circuit, unless the decision is manifestly erroneous).

MCI's claim to have successfully avoided two other class actions by picking off the named plaintiffs is not controlling here.  The unpublished opinions in Manson v. MCI, Inc., Case No 04-73374 (E.D. Mich. Feb. 24, 2005), appeal docketed, No. 05-1515 (6th Cir. Apr. 26, 2005), and Labora v. MCI Telecomm. Corp., Case No. 98-1073-CIV-HIGHSMITH (S.D. Fla. July 20, 1998), cited by MCI, either predate or ignore the teachings of Weiss and the other cases cited above.  Moreover, the court in Manson believed that the entire class action would be moot, because MCI indicated that it was in the process of "identify[ing] *all* customers incorrectly

billed . . . [and] intend[ed] to then credit those account in full for any over-billing." <u>Manson</u>, slip op. at 8.  The same cannot be said of MCI in this class action, as MCI has made no effort to identify and refund all class members for improper MUF charges on a nationwide basis, and MCI does not say otherwise in its motion to dismiss.

    <u>Manson</u> and <u>Labora</u> have no value as precedent and should not be followed.  The Court should reject MCI's attempt to evade its jurisdiction. .

### 2. Other Class Members Are Prepared To Represent The Class

    In the alternative, the Court should allow substitution by other class members who are prepared to represent the proposed class.  <u>See</u> Declaration Of Candace Bentley In Opposition To Motion To Dismiss Class Action Complaint ("Bentley Decl."); Declaration Of Dale Yamada In Opposition To Motion To Dismiss Class Action Complaint ("Yamada Decl."); Declaration Of William Hubart In Opposition To Motion To Dismiss Class Action Complaint ("Hubart Decl."). As described in their declarations, Ms. Bentley, Mr. Yamada and Mr. Hubart were not customers of MCI at any time relevant to the Complaint.  MCI billed each of them for an MUF and related charges.  Despite their efforts, MCI refused to refund or credit the unauthorized charges they paid.  <u>See</u> <u>id.</u>

    Ms. Bentley, Mr. Yamada, and Mr. Hubart are prepared to act class representatives, if requested by the Court or required by the needs of this class action.  <u>See</u> Bentley Decl., ¶ 14; Yamada Decl., ¶ 11; Hubart Decl., ¶ 12.  Thus, even if MCI were allowed to credit Ms. Everett, other class members would come forward to represent the class.

### B. The Court Should Not Refer This Class Action To The FCC Under The Doctrine Of Primary Jurisdiction

    The Complaint alleges that MCI set up unauthorized accounts on behalf of non-customers and charged them the MUF without verifying whether they intended to become MCI customers.  Plaintiff's allegations of consumer fraud are well within the competence of this Court and should not be referred to the FCC under the primary jurisdiction doctrine.

### 1. Legal Standards Governing Primary Jurisdiction

    "The doctrine of primary jurisdiction allows a federal court to refer a matter extending

1    beyond the 'conventional experiences of judges' or 'falling within the realm of administrative

2    discretion' to an administrative agency with more specialized experience, expertise, and

3    insight." <u>National Comms. Ass'n v. AT&T Co.</u>, 46 F.3d 220, 222-23 (2d Cir. 1995) (citation

4    omitted) (cited with approval in <u>Brown v. MCI Worldcom Network Servs., Inc.</u>, 277 F.3d 1166,

5    1172-73 (9th Cir. 2002)). <u>See also</u> <u>Arsberry v. Illinois</u>, 244 F.3d 558, 563 (7th Cir. 2001). It

6    "does not require that all claims within an agency's purview be decided by the agency." <u>Brown</u>,

7    277 F.3d at 1172.

8        While "[t]here is no fixed formula for determining whether an agency has primary

9    jurisdiction," four factors courts have considered are: "(1) whether the question at issue is

10   within the conventional experience of judges or whether it involves technical or policy

11   considerations within the agency's particular field of expertise; (2) whether the question at issue

12   is particularly within the agency's discretion; (3) whether the exists a substantial danger of

13   inconsistent rulings; and (4) whether a prior application to the agency has been made." <u>MCI</u>

14   <u>Telecomm. Corp. v. John Mezzalingua Assocs.</u>, 921 F. Supp. 936, 941 (N.D.N.Y. 1996). <u>See</u>

15   <u>also</u> <u>National Comms.</u>, 46 F.3d at 222-23. The doctrine "'should seldom be invoked unless a

16   factual question requires both expert consideration and uniformity of resolution.'" <u>United States</u>

17   <u>v. McDonnell Douglas Corp.</u>, 751 F.2d 220, 224 (8th Cir. 1984) (citation omitted). In deciding

18   whether to refer an issue, courts should "balance the advantages of applying the doctrine against

19   the potential costs resulting from complications and delay in the administrative proceedings."

20   <u>National Comms.</u>, 46 F.3d at 223; <u>see also</u> <u>MCI Telecomm.</u>, 921 F. Supp. at 941 n.7.

21       The doctrine of primary jurisdiction does not extend to cases where "the issue at stake is

22   legal in nature and lies within the traditional realm of judicial competence." <u>Goya Foods, Inc. v.</u>

23   <u>Tropicana Prods., Inc.</u>, 846 F.2d 848, 851 (2d Cir. 1988) (citing <u>Nadar v. Allegheny Airlines,</u>

24   <u>Inc.</u>, 426 U.S. 290, 304 (1976)). "The standards to be applied in an action for fraudulent

25   misrepresentation are within the conventional competence of the courts, and the judgment of a

26   technically expert body is not likely to be helpful." <u>Nadar</u>, 426 U.S. at 305-06.

27       "A court 'should be reluctant to invoke the doctrine of primary jurisdiction, which often,

28   but not always, results in added expense and delay to litigants. . . .'" <u>McDonnell Douglas</u>, 751

1   F.2d at 224 (quoting <u>Mississippi Power & Light Co. v. United Gas Pipe Line Co.</u>, 532 F.2d 412,

2   419 (5th Cir. 1976)).  "Nor is it intended to 'secure expert advice' for the courts from regulatory

3   agencies every time a court is presented with an issue conceivably within the agency's ambit."

4   <u>Brown</u>, 277 F.3d at 1172.  "'Expertise' is no talisman dissolving a court's jurisdiction," <u>id.</u>, and

5   a court should remain mindful of its "'virtually unflagging obligation' to exercise jurisdiction

6   given it." <u>Anderson v. Farmland Indus.</u>, 45 F. Supp.2d 863, 867 (D. Kan. 1999).

7   **2.    Agency Expertise Is Not Necessary To Adjudicate The Allegations**
8   **Of Consumer Fraud In The Complaint**

9       Resolution of the claims alleged in the Complaint is within the conventional experience

10  of the Court and does not require deference to any specific expertise of the FCC.  MCI's internal

11  documents show that, to generate additional revenue, MCI enrolled "zero-usage" customers in

12  calling plans with minimum monthly fees.  The causes of action, brought under the

13  Communications Act and the common law, assert that MCI engaged in a deceptive scheme.

14  They do not challenge the reasonableness of MCI's MUF, but rather MCI's decision to assess an

15  MUF to non-customers.  The conducted alleged is well within the conventional experience of

16  this Court.

17      In <u>Gilmore v. Southwestern Bell Mobile Systems, L.L.C.</u>, 210 F.R.D. 212 (N.D. Ill.

18  2001), the plaintiff alleged that Southwestern Bell improperly charged a Corporate Account

19  Administrative Fee for cellular telephone service.  <u>See</u> <u>id.</u> at 215.  Plaintiff asserted that he did

20  not agree to pay the fee and that Southwestern Bell deliberately imposed the fee solely to raise

21  additional revenue without appearing to have raised rates.  <u>See</u> <u>id.</u> at 216.  The first amended

22  complaint asserted claims under Sections 201(b) and 202(a) of the Communications Act.  The

23  district court denied Southwestern Bell's motion to dismiss under the primary jurisdiction

24  doctrine.  The court found that the Communications Act claims did not directly attack the

25  reasonableness of the rate, but rather asserted that "defendant breached the [cellular telephone

26  services] contract by adding an additional charge (the Fee) without providing any additional

27  service.  Also, it is claimed that defendant acted in a fraudulent or deceptive manner in adding

28  the Fee." <u>Id.</u> at 222.  The court concluded that, "[c]laims of contract breach, fraud, and

deception related to the sale of a service or product are well within the conventional experience of a court." Id. (citing Nader, 426 U.S. at 305-06). "Resolving those questions does not require consideration of matters within the particular expertise of the FCC." Id.

Other courts have similarly refused to refer Communications Act claims involving fraud to the FCC. See Towne Reader Serv., Inc. v. MCI Telecomm. Corp., 91-CV-115S, 1992 U.S. Dist. LEXIS 13569, at *17-18 (W.D.N.Y. Aug. 11, 1992) ("[P]laintiff's primary contention in the above counts[,] … that defendant made inaccurate representations and that its charges did not confirm with its tariff or contract with plaintiff … is properly one for the courts and not the administrative agency."); The Bruss Co. v. Allnet Comm. Servs., Inc., 606 F. Supp. 401 (N.D. Ill. 1985) (denying motion to dismiss Communications Act claims under primary jurisdiction doctrine which alleged overcharge and fraud in violation of tariffs). See also Arsberry, 244 F.3d at 563 (denying request to refer claims to FCC where there was no indication that the FCC had special expertise that would be useful in evaluating a claim of collusion); Indiana Bell Tel. Co. v. Ward, Case No. IP 02-170-C H/K, 2002 U.S. Dist. LEXIS 26013, *23 (S.D. Ind. Dec. 6, 2002) ("The FCC has no authority to approve schemes to defraud local carriers in the name of opening up telecommunication markets.").

Similarly, the unjust enrichment cause of action provides no basis for a referral to the FCC. See, e.g., Cellular Dynamics, Inc. v. MCI Telecomm. Corp., Case No. 94 C 3126, 1995 U.S. Dist. LEXIS 4798, at *12 (N.D. Ill. Apr. 12, 1995) (declining to refer to the FCC because resolution of state law claim attacking cancellation of planned transfer of cellular telephone customers to MCI "requires no specialized knowledge of the telecommunications industry nor any administrative expertise"); Towne Reader Serv., 1992 U.S. Dist. LEXIS 13569, at *18 ("Plaintiff's common law and state statutory claims are also within the expertise of judges and not administrative agencies. As these claims are standard fare for judges and will require no administrative discretion, this Court need not relinquish its authority to the FCC."); Redding v. MCI Telecomm. Corp., No. C-86-5498-CAL, 1987 U.S. Dist. LEXIS 16073, at *14 (N.D. Cal. Sep. 29, 1987) (declining to refer common law claims to the FCC).

MCI's contention that only the FCC can determine whether MCI or the LECs are liable for the wrongful billing scheme makes little sense.   Plaintiff alleges that MCI decided to assess MUFs to non-customers and that MCI received payments for those fees.  See Complaint, ¶¶ 15-18.  MCI does not suggest that the LECs kept money collected on behalf of MCI.  No administrative expertise is needed to decide whether MCI caused is liable for the return of the unauthorized charges it collected.

### 3.     The FCC Has No Interest In The Issues Raised In This Case

Contrary to MCI's contention, the rulemaking proceeding in In the Matter of Rules and Regulations Implementing Minimum Customer Account Record Exchange Obligations on All Local and Interexchange Carriers, FCC Docket No. 02-386 (the "Rulemaking")[3], does not support referral to the FCC.  The Rulemaking addressed a petition by AT&T, MCI and other major long-distance carriers to require the FCC to adopt a particular series of industry standards for the electronic exchange of customer information known as CARE, Customer Account Record Exchange.  See Notice, ¶ 1.  The FCC adopted certain minimum standards, but refused to require IXCs and LECs to exchange data electronically in the CARE format.  See Report & Order, ¶ 12.  The FCC recognized that the failure of the IXCs and LECs to exchange accurate customer account information places a heavy burden on consumers to rectify account errors. See id., ¶ 18. Thus, the Rulemaking was an effort by the FCC to ensure greater accuracy in the data exchange.  See id., ¶ 2.

The Rulemaking did not address the issue raised in this class action:  whether MCI violated the Communications Act after it obtained data from the LECs by establishing accounts and enrolling consumers in billing plans with MUFs without authorization.  See id., ¶ 12. MCI's decision to impose a minimum usage fee on "zero-usage" consumers is not implicated by the Rulemaking.   This case is about what MCI did with the information it got from LECs, rather than how MCI got the information from the LECs.  Any standards arising out of the Rulemaking

---

[3] MCI attached the March 24, 2005 Notice of Proposed Rulemaking (the "Notice"), and the February 25, 2005 Report and Order and Further Notice of Proposed Rulemaking (the "Report & Order") as Exhibits B and C respectively to its Motion to Dismiss.

1  for the exchange of LEC data do not come into play.  Thus, there is no need for the FCC to

2  assess MCI's misconduct in light of the Rulemaking.

3          In addition, referral of this action to the FCC will significantly delay the resolution of the

4  claims alleged here.  See Kenneth Culp Davis & Richard J. Pierce Jr., Administrative Law

5  Treatise, § 14.6 at 303-04 (noting that agency referral may result in delay of "a decade or

6  more"); Southwestern Bell Tel. Co. v. FCC, 138 F.3d 746, 750 (8th Cir. 1998) (noting delay of

7  nearly nine years by FCC to respond to appellate court referral to consider an issue that had

8  been superceded by new tariff filings); AT&T Co. v. FCC, 978 F.2d 727, 731 (D.C. Cir. 1992)

9  (noting that FCC had taken over two years to issue non-definitive ruling).

10         In sum, the issues in this litigation are not within the particular discretion of the FCC, and

11  referral to the FCC will not advance their resolution.  As a result, this factor does not weigh in

12  favor of referral to the FCC.

13              **4.    There Is No Risk of Inconsistent Rulings**

14         MCI argues that "there is a risk that this Court and the CPUC will adopt positions that

15  contradict each other."  See Mot. To Dismiss at 15.  In light of the fact that the CPUC has

16  already settled the California action, this argument no longer holds any water, assuming it ever

17  did.  The primary jurisdiction doctrine is concerned with whether this Court's decisions would

18  result in inconsistent interpretations of the Communications Act and FCC rulings, not with

19  whether they would be at variance with a settlement of California state law claims.  See, e.g.,

20  RCA Global Comms., Inc. v. Western Union Tel. Co., 521 F. Supp. 998, 1006 (S.D.N.Y. 1981)

21  ("[S]ince there is no pending dispute before the FCC involving the same claim, there is no

22  danger of inconsistent rulings.").

23         Everett alleges that MCI's billing practices deceived consumers.  The FCC has no

24  demonstrable interest or expertise in adjudicating the factual issues that underlie this case.  See

25  Lipton v. MCI WorldCom, Inc., 135 F. Supp.2d 182, 191 (D.D.C. 2001) ("There are no factual

26  inquiries requiring the particular expertise of the administrative agency, and therefore no

27  substantial danger of inconsistent rulings.").  Moreover, this Court has the authority to grant

28  declaratory and injunctive relief to a nationwide class to prevent MCI from engaging in these

1    deceptive billing practices.  In the absence of such a decision, any practice which MCI intends

2    to change as a result of the settlement with the CPUC would benefit California consumers only.

3         In sum, deference to the FCC is not necessary to ensure consistent, uniform rulings.

4                **5.    The Absence Of A Prior Application To The FCC Weighs**
                         **Against Referral**
5

6         MCI acknowledges that Plaintiff and other class members have not made a prior

7    application to the FCC on the issues raised in the class action.  MCI is wrong in contending

8    however, that the absence of such a prior application supports referral.  See MCI Telecomm.,

9    921 F. Supp. at 941 (declining to refer to FCC where "no prior application has been made to the

10   FCC regarding this matter"); Lipton, 135 F. Supp.2d at 191-92 ("There is no indication that the

11   plaintiff made a prior application to the FCC.  Accordingly, the court will decline the

12   defendants' invitation to refer this matter to the FCC under the doctrine of primary

13   jurisdiction.").

14        In sum, none of the factors weigh in favor of referring this class action to the FCC.

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1

## IV.   CONCLUSION

2      In conclusion, Plaintiff requests that the Court deny MCI's motion to dismiss.

3

4   DATED:  October 31, 2005                **GIRARD GIBBS & De BARTOLOMEO LLP**

5                                           By:   _/s/ Aaron M. Sheanin_____
6                                                    Aaron M. Sheanin

7                                           Daniel C. Girard
8                                           601 California Street, Suite 1400
                                            San Francisco, California 94108
9                                           Telephone: (415) 981-4800
                                            Facsimile: (415) 981-4846
10

11                                          Robert B. Carey
                                            Stephanie Levin Bozzo
12                                          **HAGENS BERMAN SOBOL SHAPIRO PLLC**
                                            2425 E. Camelback Road, Suite 650
13                                          Phoenix, Arizona 85016
                                            Telephone: (602) 840-5900
14                                          Facsimile: (602) 840-3012

15                                          Grant Woods
16                                          **GRANT WOODS, PC**
                                            1726 North Seventh Street
17                                          Phoenix, Arizona 85006
                                            Telephone: (602) 258-2599
18                                          Facsimile: (602) 258-5070

19
                                            Attorneys for Individual and Representative Plaintiff
20

21

22

23

24

25

26

27

28