UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHARY and TOM EVERETT, and CANDACE BENTLEY, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs<br><br>v.<br><br>VERIZON BUSINESS GLOBAL, LLC, a Delaware Corporation, f/k/a MCI, Inc.<br><br>        Defendant. | Case No. 07 Civ. 9590 (DC)<br><br>**[PROPOSED] FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Shary and Tom Everett and Candace Bentley, on behalf of themselves and all others similarly situated throughout the United States, allege by and through their attorneys, upon information and belief, as follows:

## JURISDICTION AND VENUE

1. This action asserts claims for violations of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, et seq.; and for unjust enrichment. This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332(d) and 1367, and 47 U.S.C. § 207.

2. This action was originally filed on July 18, 2005, in the United States District Court for the District of Arizona, where venue was proper pursuant to 28 U.S.C. § 1391(b)(2). A substantial number of the acts giving rise to the violations of law complained of herein occurred and had their primary effect in that judicial district. On Defendant's motion, this action was referred to the bankruptcy court and transferred to the Southern District of New York. Accordingly, Defendant has consented to venue in this judicial district.

## NATURE OF THE CASE

3. This class action arises out of a decision by MCI, Inc., predecessor-in-interest to

Defendant Verizon Business Global, LLC, ("MCI") to implement an aggressive billing initiative directed at non-customers of MCI. MCI harvested data from local telephone service providers on hundreds of thousands of consumers who did not have active long-distance accounts with MCI. MCI then activated accounts for these consumers in its "Basic Dial-1" default billing plan without their authorization or consent, and sent them bills for approximately seven to ten dollars in monthly charges. These charges included minimum usage fees or monthly recurring charges and related fees and taxes. As a result, MCI has billed monthly charges to hundreds of thousands of persons, despite the fact that they never authorized, requested or used MCI telecommunication services and had no valid contractual or customer relationship with MCI at any relevant time.

4. Consumers who detected these unauthorized charges from MCI and attempted to dispute them reported that MCI representatives often refused to reverse, refund or credit back the charges. Consumers also reported that MCI representatives conditioned the issuance of refunds or credits on the consumer's agreement to subscribe to MCI for long-distance service, or otherwise used the improper billings as a means to sell MCI services. Consumers who did not pay MCI for the unauthorized charges were threatened with adverse notations on their credit reports and/or turned over to collections agencies.

5. On behalf of themselves and all similarly situated persons throughout the United States, Plaintiffs bring claims for violations of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, et seq. ("Communications Act"), and for unjust enrichment.

## THE PARTIES

6. Plaintiffs Shary and Tom Everett are citizens of Arizona, residing in Goodyear, Arizona.

7. Plaintiff Candace Bentley is a citizen of Oklahoma, residing in Harrah, Oklahoma.

8. Defendant Verizon Business Global, LLC, formerly known as MCI LLC, is the successor-in-interest to MCI, Inc., the defendant in this action when the case was filed. Verizon Business Global, LLC is a Delaware corporation with its principal place of business at One Basking Ridge Way, Basking Ridge, New Jersey. Defendant is referred to herein as "MCI."

During the class period, MCI provided long-distance telephone service to consumers throughout the United States.

## SUBSTANTIVE ALLEGATIONS

### Defendant MCI's Unlawful Billing Practices

9.   Before the beginning of the class period, MCI's relationships with its customers were governed by the tariff it filed with the Federal Communications Commission ("FCC"). Upon detariffing, the FCC directed long-distance carriers such as MCI to "establish legal relationships with their customers in an alternative way, for example, by issuing short, standard contracts that contain their basic rates, terms and conditions of service." Interstate Interexchange Marketplace (Second Report & Order), 11 FCC Rcd. 20730, 20807, ¶ 150 (1996).

10.   As of April 1, 2002, MCI offered to provide long-distance services to its customers under the terms of a standardized General Services Agreement For Residential Customers ("GSA"). MCI amended its GSA from time to time during the class period. Each version of the GSA defines the exclusive manner of acceptance of the contract in the same way: "BY ENROLLING IN, USING, OR PAYING FOR COMPANY SERVICES, YOU AGREE TO THE RATES, CHARGES, AND TERMS AND CONDITIONS IN THIS AGREEMENT."

11.   Throughout the class period, MCI only had the authority to bill and collect monthly charges from consumers with whom it had valid legal or contractual relationships governed by the GSA. MCI had no legal authority or justification for billing consumers who had not entered into valid legal or contractual relationships, had not agreed to establish an account with MCI, and did not use the MCI network.

### MCI Harvested Inaccurate Billing Data From Local Exchange Carriers About Non-Customers Of MCI

12.   Consumers who buy telephone services for a specific telephone line are called "end-users." End-users contract with local exchange carriers ("LECs") for local telephone service and with "primary interexchange carriers" ("IXCs") for long-distance telephone service. The LECs maintain records of the IXCs to which their end-users subscribe for long-distance

3

service.

13.     The billing scheme at issue in this litigation arises out of MCI's "business decision" to rely on electronic data from the LECs alone as providing sufficient justification for treating an end-user associated with a telephone number as an MCI customer.

14.     During the class period, MCI bought and received LEC data to identify telephone lines that are shown in LEC databases as being assigned or "presubscribed" to MCI for long-distance service.

15.     The LEC data MCI received was often dated, inaccurate and unreliable. During the class period, the LEC data identified end-users who had never been MCI customers as being presubscribed to MCI. The LEC data also identified one-time MCI customers who had previously canceled MCI service as being presubscribed to MCI.

16.     MCI activated "accounts" for end-users upon receiving LEC data identifying them as presubscribed to MCI. Because these end-users had not affirmatively selected an MCI billing plan, MCI placed them by default in its "Basic Dial-1" billing plan.

## MCI Billed Monthly Charges To Non-Customers

17.     In March 2002, MCI devised a plan to increase its revenues by millions of dollars, by billing a $3 minimum usage fee to consumers on the "Basic Dial-1" billing plan. Under this plan, end-users who did not generate bills with at least $3 in charges for long-distance telephone calls in a given month would be charged the difference between the $3 minimum usage fee and the total charges for the calls made during that month.

18.     MCI expected to generate much of these revenues from millions of end-users who did not use MCI for long-distance calls, had not affirmatively selected a calling plan, and were placed by default on the "Basic Dial-1" billing plan. MCI considered these end-users to be "zero usage non-Plan consumer customers." Before MCI implemented the minimum usage fee in June 2002, these end-users did not generate revenue for MCI.

19.     According to an internal MCI Business Case Write-up, MCI decided that it "needed to generate an additional $24.6M in revenue through the application of the new $3

minimum usage fee from zero usage non-Plan Consumer customers. . . ." MCI's documents show that MCI established the minimum usage fee program because not doing so would "unnecessarily avoid[] a significant source of additional revenue from this customer segment."

20. In June 2002, MCI started assessing a $3 minimum usage fee to end-users for whom MCI had activated Basic Dial-1 accounts. At subsequent times, MCI increased the minimum usage fee and then replaced the minimum usage fee with a monthly recurring charge. The monthly recurring charge was imposed on all Basic Dial-1 accounts regardless of whether they had long-distance traffic on the MCI network.

21. The "zero usage non-plan consumer customers" whom MCI billed had not contracted with MCI at any relevant time, did not use MCI long-distance services at any relevant time, and instead either contracted for long-distance service with carriers other than MCI or previously canceled their MCI long-distance service. MCI had no legal authority to assess minimum usage fees or monthly recurring charges to these end-users. Nevertheless, by billing monthly charges to these end-users, MCI represented that they incurred the charges, and that they owed MCI payment for such charges.

22. During the class period, MCI assessed unauthorized monthly charges to a substantial number of consumers nationwide. In California alone, MCI assessed minimum usage fees to approximately 500,000 consumers between July 2002 and February 2004.

23. MCI obstructed the efforts of consumers to obtain credits, adjustments or refunds of the improper charges. Consumers have complained that, in response to requests for refunds and corrections to MCI billing records, MCI representatives promised refunds and corrections which were subsequently not made, that MCI issued "credits" to consumers who were not MCI customers and thus could not use the credits, and that even if MCI issued a credit or refund for unauthorized charges, the unauthorized charges reappeared in subsequent billing statements, or MCI imposed new, unauthorized charges in later billing periods.

24. MCI's policy and practice was to reverse, refund, or credit back unauthorized charges only to persons who threatened to bring or actually brought legal action, lodged

complaints with regulatory authorities, or took other action in response to being billed by MCI without their authorization. Consumers who did not pay unauthorized charges were turned over to collections agencies. When consumers contacted MCI to complain about the negative credit references, MCI refused to remove the negative credit references from the credit reports.

### Plaintiffs Shary and Tom Everett's Experience

25. At all relevant times, Plaintiffs Shary and Tom Everett had local residential telephone service through Qwest, and had either long-distance service through AT&T or no long-distance service.

26. The Everetts had not contracted with MCI or obtained services from MCI at any time since approximately August 2002, when they terminated MCI long-distance service.

27. In or around August 2002, the Everetts subscribed to AT&T for long-distance service. At approximately the same time at the Everetts' request, Qwest placed a "freeze" on the Everetts' account to prevent their long-distance service from being switched to another carrier without their prior knowledge and consent.

28. In or around December 2002, MCI received LEC data concerning the Everetts' telephone number. MCI activated a "Basic Dial-1" account for the Everetts on which it began assessing minimum usage fees and related charges. The Everetts did not authorize or incur the charges.

29. On several occasions, Mrs. Everett contacted MCI to have the unauthorized MCI charges reversed or removed, and to prevent MCI from assessing additional unauthorized charges. MCI's representatives refused to reverse or remove the unauthorized charges. MCI continued to assess charges to the Everetts without their authorization.

30. In or around March 2003, the Everetts received a notification that payment for the charges was past due. The notice informed the Everetts that failure to pay the charges would result in collections.

31. Subsequently, on or about April 10, 2003, Mrs. Everett sent MCI a check in the amount of $9.88 to pay in full the unauthorized charges assessed by MCI to prevent damage to

her family's credit.

32. To prevent MCI from continuing to bill them, Mrs. Everett terminated her AT&T long-distance service and restricted all long-distance service on her telephone line.

33. MCI refused to refund or credit Mrs. Everett's $9.88 payment of the unauthorized charges until after she filed this lawsuit. In September 2005, approximately two months after Mrs. Everett filed this case, MCI allegedly attempted to issue a credit to the Everetts' current LEC for the unauthorized minimum usage fees and related charges. That credit did not post to the Everetts' account until sometime in or around June 2006, over three years after the Everetts' paid the unauthorized charges in order to avoid being sent to collections by MCI.

### Plaintiff Candace Bentley's Experience

34. At all relevant times, Plaintiff Candace Bentley had residential telephone service through McLeod Telephone Company and did not have long-distance service.

35. Ms. Bentley has not contracted with MCI or obtained services from MCI at any time since approximately 2000, when she terminated MCI long-distance service.

36. On or around July 2004, MCI received LEC data concerning one of Ms. Bentley's former telephone numbers. MCI activated a "Basic Dial-1" account for Ms. Bentley on the former telephone number on which it began assessing minimum usage fees and related charges. Ms. Bentley did not authorize or incur those charges, and did not pay MCI. MCI mailed the bill to an address where Ms. Bentley had not lived for over two and one-half years.

37. In or around August 2005, MCI placed an adverse notation on Ms. Bentley's credit report for failure to pay the unauthorized charges that it assessed on Ms. Bentley's former telephone number and sent to Ms. Bentley's former address. This adverse notation reduced Ms. Bentley's credit score. As a result of the reduced credit score, Ms. Bentley received a less favorable interest rate on a home equity loan, causing her to pay more in interest than she would have otherwise paid.

38. Ms. Bentley contacted MCI to have the unauthorized charges reversed, and to have MCI remove the adverse notations from her credit report. MCI's representatives did not remove

the adverse notations from her credit report.

## CLASS ACTION ALLEGATIONS

39. Plaintiffs bring this action on behalf of themselves and all other similarly situated persons throughout the United States as members of a proposed plaintiff Class initially defined as:

> **All "zero usage non-plan consumer customers" on MCI's Basic Dial-1 plan, who were charged a minimum usage fee or monthly recurring charge on or after July 22, 2002, and who were damaged thereby.**

Excluded from the Class are persons who filed complaints seeking damages with the Federal Communications Commission, in compliance with 47 C.F.R. 1.716, 1.719, 1.720, or 1.721, regarding Defendant's conduct alleged herein; Defendant; any entity in which Defendant has or had a controlling interest; any officers or directors of Defendant; the legal representatives, heirs, successors, and assigns of Defendant; and any judge assigned to this action and his or her immediate family.

40. This action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1)-(4) and Rule 23(b)(1) or (2) or (3) of the Federal Rules of Civil Procedure and case law thereunder.

### Numerosity of the Class
### (Fed. R. Civ. P. 23(a)(1))

41. Members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs estimate that the Class comprises at least tens of thousands of members. The precise number of Class members and their addresses are unknown to Plaintiffs at this time, but can be ascertained from MCI's records. Class members may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

### Existence and Predominance of Common Questions of Fact and Law
### (Fed. R. Civ. P. 23(a)(2); 23(b)(3))

42. Common questions of law and fact exist as to all members of the Class. These

questions predominate over the questions affecting only individual Class members. These common legal and factual questions include:

    (a) Whether MCI had valid contractual or other legal relationships with "zero usage non-plan consumer customers";

    (b) Whether MCI charged minimum usage fees or monthly recurring charges to "zero usage non-plan consumer customers";

    (c) Whether MCI's billing minimum usage fees or monthly recurring charges to "zero usage non-plan consumer customers" is an unjust or unreasonable charge, practice, classification or regulation in violation of Section 201 of the Communications Act;

    (d) Whether MCI unjustly or unreasonably discriminated in charges, practices, classifications, regulations, facilities for or in connection with like communication service in violation of Section 202 of the Communications Act, by reversing, refunding or crediting minimum usage fees or monthly recurring charges to some, but not all "zero usage non-plan consumer customers";

    (e) Whether MCI was unjustly enriched by charging minimum usage fees or monthly recurring charges to "zero usage non-plan consumer customers";

    (f) Whether Class members sustained damages;

    (g) Whether MCI threatened to make and actually made negative reports to credit reporting agencies about "zero usage non-plan consumer customers" due to their failure to pay minimum usage fees or monthly recurring charges;

    (h) The nature of the relief to which Plaintiffs and Class members are entitled;

    (i) Whether the GSA constituted an offer, and if so, whether that offer was supported by consideration; and

    (j) Whether actual usage of MCI telecommunication services or other evidence of assent after receipt of the GSA was necessary for persons to have entered into customer agreements with MCI.

### Typicality of Claims
### (Fed. R. Civ. P. 23(a)(3))

43.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all other Class members, were assessed minimum usage fees or monthly recurring charges by MCI, when they were not MCI customers and had not used MCI services at any relevant time.

### Adequacy of Representation
### (Fed. R. Civ. P. 23(a)(4))

44.     Plaintiffs are adequate representatives of the Class, because their interests do not conflict with the interests of the Class members they seek to represent, and they have retained counsel competent and experienced in complex class action and telecommunications litigation. Plaintiffs' interests are aligned with those of the Class. They all share an interest in stopping MCI from: (1) charging minimum usage fees or monthly recurring charges to non-customers; (2) collecting these fees from non-customers; and (3) threatening to place and/or actually placing adverse notations on the credit reports of non-customers who refuse to pay the unauthorized charges. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

### Superiority of the Class Action
### (Fed. R. Civ. P. 23(b)(3))

45.     A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member may be small, especially given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by MCI's conduct. It would be virtually impossible for Class members individually to obtain effective redress for the wrongs done to them. Furthermore, even if the Class members themselves could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented with the complex legal and factual issues of this case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court.

**The Risk of Inconsistent or Dispositive Adjudications and
the Appropriateness of Final Injunctive or Declaratory Relief**
**(Fed. R. Civ. P. 23(b)(1) and (2))**

46.    In the alternative, this action may properly be maintained as a class action, because:

    (a)    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for MCI; or

    (b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

    (c)    MCI has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class members as a whole.

**FIRST CAUSE OF ACTION**
**(Violations of the Communications Act of 1934, 47 U.S.C. § 201)**

47.    Plaintiffs incorporate by reference and reallege each of the foregoing paragraphs as if fully set forth herein, and further allege as follows:

48.    Plaintiffs assert this claim against MCI on behalf of themselves and all Class members for violations of 47 U.S.C. § 201.

49.    47 U.S.C. § 201(b) states, "All charges, practices, classifications, and regulations for and in connection with such communication service [i.e., service for interstate or foreign communication by wire or radio], shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is hereby declared to be unlawful."

50. In violation of 47 U.S.C. § 201(b), it is unjust or unreasonable for MCI to bill persons who have no valid contractual or legal relationship with MCI for services they have not requested or received, and that MCI has not provided.

51. In violation of 47 U.S.C. § 201(b), it is unjust or unreasonable for MCI to activate accounts for, and assess monthly charges that were not incurred to, persons without their authorization.

52. MCI's placing of such unauthorized, misleading or deceptive charges on the telephone bills of Plaintiffs and Class members is a form of "cramming," and is an unjust or unreasonable practice in violation of 47 U.S.C. § 201(b). See In The Matter Of Truth-In-Billing and Billing Format, 14 FCC Rcd 7492 (FCC 1999).

53. Plaintiffs and Class members have been injured as a result of MCI's above-described violations of 47 U.S.C. § 201 in an amount to be determined according to proof.

54. Under 47 U.S.C. §§ 206 and 207, Plaintiffs and Class members are entitled to recover the full amount of damages sustained as a result of MCI's above-described violations, together with reasonable attorney's fees.

## SECOND CAUSE OF ACTION
**(Violations of the Communications Act of 1934, 47 U.S.C. § 202)**

55. Plaintiffs hereby incorporate by reference and reallege each of the foregoing paragraphs as if fully set forth herein, and further allege as follows:

56. Plaintiffs assert this claim against MCI on behalf of themselves and all Class members for violations of 47 U.S.C. § 202.

57. 47 U.S.C. § 202(a) states in relevant part:

> Charges, services, etc. It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

58.   MCI has assessed persons who were not MCI customers at any relevant time, including Plaintiffs and Class members, for charges for telephone service they did not request, authorize, subscribe to, or use. MCI has failed to reverse, refund, or credit back such unauthorized charges to Plaintiffs and Class members. MCI has reversed, refunded, or credited back charges for telephone service to other persons who were assessed such charges without authorization.

59.   MCI has violated 47 U.S.C. § 202(a) by unreasonably discriminating in charges and practices for or in connection with communication service, and by subjecting a class of consumers (namely, those persons who were assessed unauthorized charges for telephone service and for whom MCI failed to reverse, refund, or credit back such charges) to unreasonable prejudice.

60.   As a direct and proximate result of MCI's above-described practice of discrimination in violation of 47 U.S.C. § 202(a), Plaintiffs and Class members have been injured in an amount to be determined at trial.

61.   Under 47 U.S.C. §§ 206, 207, and 406, Plaintiffs and Class members are entitled both to recover the full amount of damages sustained as a result of MCI's above-described violations, together with reasonable attorney's fees, and to obtain an order enjoining MCI's wrongful conduct. Under 47 U.S.C. §§ 151, et seq., Plaintiffs and Class members also are entitled to a judgment declaring that MCI violated the Communications Act of 1934.

### THIRD CAUSE OF ACTION
#### (Unjust Enrichment)

62.   Plaintiffs hereby incorporate by reference and reallege each of the foregoing paragraphs as if fully set forth herein, and further allege as follows:

63.   Plaintiffs Shary and Tom Everett only assert this claim against MCI on behalf of themselves and all Class members for unjust enrichment.

64.   Plaintiffs and Class members had no valid contractual or other legal relationships with MCI at any relevant time.

65. MCI has assessed Plaintiffs and Class members for charges for telephone services they did not request, authorize, subscribe to, or use, and it has collected from Plaintiffs and Class members and retained money for such unauthorized charges. Accordingly, MCI has received, and continues to receive, money at the expense of Plaintiffs and Class members.

66. MCI has received benefits from Plaintiffs and Class members that it has unjustly and inequitably retained at their expense.

67. As a direct and proximate result of MCI's violations of law, Plaintiffs and Class members were deprived of the use of their monies that were unlawfully billed, collected, and retained by MCI, and are therefore entitled to restoration of their monies.

## **REQUEST FOR RELIEF**

Plaintiffs, on behalf of themselves and all others similarly situated, request the following relief:

A. An order that this action is properly brought and maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs and their counsel of record to represent the proposed Class;

B. An order declaring unlawful the acts and conduct of MCI complained of herein;

C. An order permanently enjoining MCI from engaging in the unlawful acts and conduct complained of herein and any attempts by MCI to collect the erroneous or unlawful charges it has assessed, including the reporting to credit agencies of non-payment of such charges;

D. An order that MCI withdraw or reverse any adverse reports made to credit agencies in connection with erroneous charges;

E. An order compelling restitution, disgorgement, and/or other equitable relief as the Court deems proper;

F. A judgment declaring that MCI violated the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, et seq.;

G. An award of compensatory damages to Plaintiffs and the Class, together with an award of consequential and incidental damages and costs suffered by Plaintiffs and Class members because of MCI's wrongful conduct;

H. An award of pre-judgment and post-judgment interest to Plaintiffs and the Class;

I. An award of reasonable attorneys' fees and costs incurred by Plaintiffs and the Class in this action, including expert-witness fees; and

J. Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

*Deemed Filed July 16, 2008 by*
*July 16, 2008 Court Order*

DATE SIGNED: August 5, 2008

**GIRARD GIBBS LLP**

By: _____
A. J. De Bartolomeo (pro hac vice)
Daniel C. Girard (pro hac vice)
Jonathan K. Levine (JL-8390)
Aaron M. Sheanin (pro hac vice)
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Attorneys for Individual and Representative Plaintiffs

## CERTIFICATE OF SERVICE

I, A. J. De Bartolomeo, hereby certify that on August 5, 2008, I caused the following document(s) to be filed electronically with the United States District Court for the Southern District of New York through the Court's mandated ECF service:

1. [PROPOSED] FIRST AMENDED CLASS ACTION COMPLAINT

Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of August, 2008 at San Francisco, California.

_/S/ A. J. De Bartolomeo_